**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 26, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

EIGHTEEN SEVENTY, LP; MARIE
KENNEDY FOUNDATION,

      Plaintiffs - Appellants,

v.

RICHARD JAYSON,

      Defendant - Appellee.

No. 20-8015

---

**Appeal from the United States District Court**
**for the District of Wyoming**
**(D.C. No. 2:19-CV-00022-SWS)**

---

Leah C. Schwartz, Ranck & Schwartz, LLC, Jackson, Wyoming, for Plaintiffs-Appellants.

Tyler J. Garrett, Hathaway & Kunz, LLP, Cheyenne, Wyoming, for Defendant-Appellee.

---

Before **HARTZ**, **HOLMES**, and **PHILLIPS**, Circuit Judges.

---

**HOLMES**, Circuit Judge.

---

This case presents an issue of whether a federal court in Wyoming has

personal jurisdiction over a defendant who is domiciled and resides in the United

Kingdom and has never visited Wyoming. Over the course of four years,

Plaintiffs-Appellants Eighteen Seventy, LP and the Marie Kennedy Foundation (the "Kennedy Entities" or "Entities") lost more than $10 million that they invested in CRUPE Pte. Ltd. ("CRUPE") and its subsidiaries. CRUPE is a foreign company organized under the laws of Singapore and managed in Zurich, Switzerland. Believing that CRUPE's co-founder and CFO, Defendant-Appellee Richard Jayson, induced their investment losses through misrepresentations and material omissions, the Kennedy Entities sued Mr. Jayson for gross negligence and breach of fiduciary duty in the U.S. District Court for the District of Wyoming. The Entities—both of which have their principal place of business in Wyoming—averred that Mr. Jayson surreptitiously used their financial support to compensate himself and another company co-founder while failing to provide the Kennedy Entities with information about CRUPE's viability and the true nature of their investments.

Mr. Jayson, a domiciliary and resident of the United Kingdom, moved to dismiss the Kennedy Entities' suit, pursuant to Federal Rule of Civil Procedure 12(b)(2), arguing that the court lacked personal jurisdiction over him. The district court agreed with Mr. Jayson and dismissed the complaint.

The Kennedy Entities now appeal, claiming the district court erred when it held that Mr. Jayson lacked the requisite minimum contacts with Wyoming to afford the court personal jurisdiction. They contend that Mr. Jayson purposefully directed his tortious activities at Wyoming by preparing investment documents

2

that encouraged the Kennedy Entities' investments and by communicating with the Entities' owners about the investments.  Because the Kennedy Entities' losses allegedly stemmed from these actions of Mr. Jayson, they assert that they have made a prima facie showing of his minimum contacts with Wyoming.  Accordingly, they urge us to hold that the court erred in determining that it lacked personal jurisdiction over Mr. Jayson and to reverse the district court's judgment and remand for further proceedings.

However, exercising jurisdiction under 28 U.S.C. § 1291, we **affirm** the district court's judgment dismissing this action for lack of personal jurisdiction.  Stated concisely, because the Kennedy Entities assert a "purposeful direction" theory of personal jurisdiction, the operative standard calls for an inquiry into whether the Entities have shown that Mr. Jayson's acts were (1) intentional, (2) "expressly aimed" at Wyoming, and (3) done with "knowledge that the brunt of the injury would be felt" in Wyoming.  *Dudnikov v. Chalk & Vermillion Fine Arts, Inc.*, 514 F.3d 1063, 1072 (10th Cir. 2008).

Although the Kennedy Entities meet the first prong of the purposeful direction test, they fail to satisfy the second: that is, they fail to show that Mr. Jayson expressly aimed his conduct at Wyoming.  Because the Kennedy Entities' failure to make this showing is sufficient, standing alone, to fatally undercut their efforts to show purposeful direction and, more generally, to establish a prima facie case of personal jurisdiction over Mr. Jayson, we end our analysis there and

3

uphold the district court's judgment. The upshot is that the Kennedy Entities'

appellate challenge fails.

# I

## A

The Kennedy Entities are organized under the laws of Delaware. Each has

a principal place of business in Big Horn, Wyoming.[1] Eighteen Seventy, LP is a

limited partnership that invests in stocks, bonds, commodities, futures, and other

investment instruments, including private equity, while the Marie Kennedy

Foundation is a private foundation that "makes grants to qualified grantees from a

pool of capital, which is invested to generate funds for grants." Aplts.' App.,

Vol. I, ¶ 7, at 7 (Compl., filed Jan. 31, 2019). Two brothers—Wyoming resident

Peter Kennedy and Florida resident Paul Kennedy—make the investment

decisions for each Entity. A third brother, John Kennedy—also a resident of

Wyoming—owns Eighteen Seventy along with Peter and Paul. In addition to each

Entity having its headquarters in Wyoming, Eighteen Seventy maintains its

minute book and other corporate documents in Wyoming. The record does not

---

[1]    In reviewing a district court's grant of a motion to dismiss for lack of personal jurisdiction, we construe the facts "in the light most favorable to plaintiffs." *Dudnikov*, 514 F.3d at 1068.

tell us, however, whether either entity has any Wyoming-based investments or bank accounts.[2]

**B**

In 2011, Eighteen Seventy was introduced to Stuart Robertson, CRUPE's CEO and co-founder, regarding a possible capital investment in CRUPE. CRUPE claimed to have developed a unique building substance used in construction, which derived its value from being "environmentally-friendly, seismically, thermally and acoustically superior[,] . . . lighter than other building materials[,] . . . [and] fire-retardant." *Id.*, ¶ 30, at 12. CRUPE, based in Singapore and managed in Zurich, Switzerland, sought investments around the world to develop and market this product. Prior to investing in CRUPE, the Kennedy Entities allege that they were advised that CRUPE's unique building substance was technology that could not be reverse-engineered and was protected by patents pending in the United States and abroad. Furthermore, they allegedly were assured that "the technology, patent position, know-how and registered trademarks constituted the intellectual property of CRUPE"—owned through a CRUPE subsidiary, CRUPE IP GmbH. *Id.*, ¶ 31, at 12–13. The Entities considered this technology (the "CRUPE IP" or "IP") to be CRUPE's most valuable asset.

---

[2]    The Kennedy Entities assert in their briefing on appeal that "[s]everal of the Foundation's grantees are Wyoming non-profits," Aplts.' Opening Br. at 3 n.2, but there is no support for this assertion in either the complaint or the record.

Mr. Jayson, a resident of the U.K., did not participate in these initial investment-related discussions, which took place over email and in meetings held outside of the United States. As CRUPE's director and CFO, Mr. Jayson was responsible for gathering information and drafting documents for potential investors. He first became involved with the Kennedy Entities indirectly, when he helped prepare a confidential memorandum ("Confidential Memorandum") for those interested in investing in CRUPE.[3] CRUPE's attorney, Andreas Bihrer, subsequently emailed the memorandum to Peter and Paul Kennedy.

After reviewing the Confidential Memorandum, Eighteen Seventy, along with eleven other international investors, entered into a written investment agreement (the "Investment Agreement") with CRUPE on February 15, 2012. *See* Aplts.' App., Vol. II, at 381 (Investment Agreement, dated Feb. 15, 2012) (showing investors located in St. Lucia, the British Virgin Islands, Hong Kong, Switzerland, the United Kingdom, and Singapore); *see also* Aplts.' Opening Br. at 8 (asserting that Eighteen Seventy decided to invest in CRUPE "[b]ased on the Confidential Memo and accompanying documents"). The Investment Agreement

---

[3]    Apparently, the Confidential Memorandum was sent to potential investors besides the Entities because the memorandum is not specifically tailored to the Entities and offers advisements—speaking generally—to a class of "[p]otential investors." Aplts.' App., Vol. II, at 421 (Confidential Mem., dated Nov. 2011). In this vein, Mr. Jayson asserts that his "assistance" with this memorandum "came before the Kennedy Entities came on the scene, as those documents had to be reviewed and approved by CRUPE's Board of Directors before being sent to potential investors." Aplee.'s Resp. Br. at 36. The Entities do not dispute this assertion as it relates to the initial Confidential Memorandum.

assured investors that "all the IP will be held, registered, maintained and developed by the Company and its subsidiaries henceforth as owner of the IP." Aplts.' App., Vol. II, at 396.  It also imposed upon all CRUPE directors—including Mr. Jayson—obligations separate from those of the Company itself, including duties to: (1) "ensure that all decisions which are material . . . shall be taken at a properly convened board meeting," (2) "procure . . . all reasonable steps within their respective powers to sufficiently protect [the Company and its subsidiaries'] intellectual property rights," (3) refrain without Board approval from "enter[ing] into any transaction to transfer or license any IPR [i.e., IP rights]," and (4) refrain from incurring over one million euros in debt. *Id*. at 391–93.  This agreement, along with all of CRUPE's subsequent investment agreements, provided that it was governed by Swiss law and subject to Swiss jurisdiction.  Mr. Jayson reviewed, commented on, and later signed the agreement, which listed Eighteen Seventy's address in Wyoming along with those of the other investors; he did not, however, have any direct contact with Eighteen Seventy during this time.

In accordance with the initial Investment Agreement and subsequent agreements involving the Kennedy Entities, they invested a total of $10 million in CRUPE and its subsidiaries through share purchases and loans from 2012–2016,

7

becoming CRUPE's largest investors.[4]  During this period, Paul and Peter

Kennedy met with Mr. Jayson several times in the course of their business

dealings with CRUPE; all of these meetings, however, took place outside of the

United States.

For example, in the spring of 2012, following Eighteen Seventy's initial

investment, Peter Kennedy (the Wyoming resident) met with Mr. Jayson and Mr.

Robertson in Hong Kong, where Mr. Jayson "extolled the opportunities for

CRUPE in China." *Id*. at 475 (Peter Kennedy Decl., filed Oct. 25, 2019).  The

meeting allegedly convinced Eighteen Seventy to make a second investment, and

Mr. Bihrer emailed Peter and Paul—copying Mr. Jayson—with another

subscription agreement containing Eighteen Seventy's address in Wyoming.[5]

Pursuant to this agreement, Eighteen Seventy purchased another $1.8 million

worth of CRUPE shares on July 7, 2012.

Later, in September 2012, Peter and Paul met with Mr. Jayson and other

CRUPE executives overseas, where they discussed Eighteen Seventy's

willingness to provide CRUPE with a $2 million loan in lieu of a traditional

investment.  Following that meeting, in an email primarily directed at Mr.

---

[4]    In 2014, Paul Kennedy also became a member of CRUPE's Board.

[5]    Though this specific email from Mr. Bihrer had a field or space expressly designated for any "Cc," most of the emails discussed herein technically did not have such a space or field, but the emails' contents leave no doubt whom the sender was conversing with, or directing questions to, in the emails and, on the other hand, whom the email sender was courtesy copying.

Robertson—which copied Mr. Jayson and Peter Kennedy (the Wyoming resident)—Paul Kennedy (the Florida resident) mentioned his interest in speaking with Mr. Jayson on the phone to go over "a few balance sheet-related questions." *Id.* at 483–84 (Email Exchange, dated Sept. 25, 2012).  Mr. Jayson responded regarding his availability for a phone call in an email exchange with Paul Kennedy.  *See, e.g.*, *id.* at 484 (noting that he would be available on "Thursday . . . anytime U.S. time").  This email exchange courtesy copied Peter Kennedy and Mr. Robertson.  And Mr. Jayson subsequently sent via email to Paul Kennedy a copy of CRUPE's "sales analysis"; notably, only Mr. Robertson was copied on this email—not Peter Kennedy.  *Id.* at 485.  After further discussions, which apparently involved Mr. Jayson and Paul (the Florida resident), the Kennedy Entities provided the loan, with shares of CRUPE's subsidiaries—including CRUPE IP, which owned the intellectual property rights—serving as collateral.

In 2013, Mr. Jayson ran several analyses of CRUPE Framing, a CRUPE subsidiary formed to hold title to "rollformer" machines, which used CRUPE's material to produce building frames.  *Id.*, Vol. I, ¶ 52, at 19.  In August 2013, Mr. Jayson emailed Paul Kennedy (the Florida resident) answering several questions about these analyses and stating that CRUPE Framing "expect[ed] to outperform the business plans . . . [and] want[ed] to ensure [it] ha[d] sufficient funding in place to run the business."  *Id.*, Vol. II, at 368–71 (Email Exchange, dated Aug. 21, 2013).  The Kennedy Entities allege that they loaned CRUPE Framing

an additional $920,000 ($500,000 from Eighteen Seventy and $420,000 from the Foundation) as a result of these representations.  The first page of the resulting investment agreement, which Mr. Jayson signed, identifies Eighteen Seventy as "lender" and lists Eighteen Seventy's Wyoming address by handwritten edit.  *Id.* at 315 (Loan Agreement, undated).  Mr. Jayson emailed only Paul as part of this transaction, however, and there is no record of Mr. Jayson otherwise communicating with the Entities in relation to this deal.

Finally, Mr. Jayson participated in meetings with Peter and Paul Kennedy in Zurich and Hong Kong in the spring of 2014.  During these meetings, Mr. Jayson produced and discussed CRUPE's cash flow documents.  Based on these documents, the Kennedy Entities agreed to restructure a previous $2 million loan to provide CRUPE with an additional $700,000 loan, plus an additional $300,000 equity investment.[6]

In addition to his in-person meetings abroad with members of the Kennedy family, Mr. Jayson also was copied on several email exchanges with the Kennedy Entities, some of which involved their decisions to invest.  In most of these email exchanges, Mr. Jayson did not participate in the communications, and was only courtesy copied.  Those few communications where Mr. Jayson directly provided information about CRUPE's business operations and financials were addressed

---

[6]    Peter Kennedy also alleges that he met Mr. Jayson for dinner in Zurich "in early 2013," although it is unclear if this meeting involved the CRUPE investment.  *See* Aplts.' App., Vol. II, at 475.

only to Paul Kennedy (the Florida resident).  The only three communications by Mr. Jayson involving Peter Kennedy (the Wyoming resident) are emails to Paul in which Peter is courtesy copied: his two emails responding to Paul's email scheduling a call following the September 2012 meeting abroad and an email responding to Paul's recommendation for a potential recruiting hire in China.

## C

Nearly four years after the Kennedy Entities' initial investments, they allegedly uncovered evidence that CRUPE's leadership had surreptitiously transferred CRUPE's IP out of the company "to a Foundation established and controlled" by Mr. Jayson and Mr. Robertson, and had overstated CRUPE's annual revenue by hundreds of millions of dollars.  *See* Aplts.' App., Vol. II, at 267 (Paul Kennedy Decl., filed Oct. 25, 2019).  By then, CRUPE was on the verge of defaulting on its loans from the Kennedy Entities.

As part of a flurry of legal proceedings spawned by this discovery, Paul Kennedy brought a federal lawsuit in his home state of Florida against Mr. Robertson, his wife, Mr. Bihrer, and the entities they controlled—but, crucially, not against Mr. Jayson—based in part upon Paul's own personal investments in CRUPE (the "Florida Lawsuit").  The Kennedy Entities joined Paul as plaintiffs in the Florida Lawsuit, raising similar allegations as those in the instant case. The Florida district court found that it had personal jurisdiction over the defendants, based on allegations that the "[d]efendants made numerous phone

calls and sent numerous emails, documents, sales pitches and offerings to Plaintiff [Paul] Kennedy in Florida," and that "[Paul] Kennedy was in Florida for many of the Board of Directors meetings where he participated." Aplts.' App., Vol. III, at 588 (S.D. Fla. Order, dated Nov. 1, 2019). It later awarded a default judgment against the defendants for $15 million.

**D**

On January 31, 2019, the Kennedy Entities commenced this lawsuit against Mr. Jayson, who had thus far avoided suit after being fired by CRUPE in 2016 for gross negligence and breach of fiduciary duty. Specifically, the Entities aver the offering documents that Mr. Jayson prepared contained several critical omissions and misstatements concerning CRUPE's corporate structure, its financial margins, conflicts of interest within its organization, and deficiencies in the underlying performance of its products. Furthermore, they allege that Mr. Jayson presented false information about CRUPE's financial performance during their meetings with him, all while secretly helping to transfer the valuable CRUPE IP out of the parent company's control.

Finally, the Kennedy Entities contend that Mr. Jayson stood silent while Mr. Robertson redirected their CRUPE investments to pay other companies that Mr. Jayson and Mr. Robertson owned, in direct contravention of their investment agreements. The Kennedy Entities allege that Mr. Jayson played a role in

inducing, in total, at least ten transactions through material misrepresentations and omissions, causing them to lose over $10 million.

Mr. Jayson filed a motion to dismiss for lack of personal jurisdiction, which the district court granted without conducting an evidentiary hearing. It found Mr. Jayson had not "purposefully directed" his activities toward Wyoming, and that the Entities' injuries did not "arise out of" any of Mr. Jayson's forum-directed activities.[7] *Eighteen Seventy, L.P. v. Jayson*, 532 F. Supp. 3d 1125, 1139–40 (D. Wyo. 2020). The Entities thus failed to meet their burden of showing Mr. Jayson had the requisite "minimum contacts" with Wyoming. The court granted Mr. Jayson's motion to dismiss due to lack of personal jurisdiction, and the Entities timely filed this appeal.

## II

Before analyzing the Kennedy Entities' specific arguments, we describe the relevant legal principles that govern this appeal. First, we outline the applicable standard of review. Next, we explain the steps of our personal jurisdiction

---

[7]    Mr. Jayson also had asserted that "his actions as a corporate agent [of CRUPE] c[ould not] be attributed to him individually for purposes of the personal jurisdiction calculus." *Eighteen Seventy, L.P. v. Jayson*, 532 F. Supp. 3d 1125, 1132 (D. Wyo. 2020). The district court held that the "no imputed contacts rule d[id] not prevent an exercise of personal jurisdiction over Mr. Jayson," because he was alleged to be a "'primary participant' in the alleged wrongdoing." *Id.* at 1133 (quoting *Calder v. Jones*, 465 U.S. 783, 790 (1984)). Furthermore, because it held that Mr. Jayson lacked the requisite minimum contacts with Wyoming, the district court found it unnecessary to address whether the fiduciary shield doctrine protected him from suit. *Id.* at 1134. Mr. Jayson does not pursue these issues in this appeal; therefore, we do not consider them further.

inquiry.  Finally, because this case requires us to evaluate whether a court's exercise of personal jurisdiction comports with due process in the context of alleged tortious conduct, we briefly introduce here (and explicate further *infra*) the "effects" test from the Supreme Court's seminal decision in *Calder v. Jones*, 465 U.S. 783 (1984), which we use to determine whether Mr. Jayson had sufficient minimum contacts with the forum state, Wyoming.

## A

The Kennedy Entities, as plaintiffs, bear the burden of establishing personal jurisdiction.  *See, e.g.*, *XMission, L.C. v. Fluent LLC*, 955 F.3d 833, 839 (10th Cir. 2020) ("The plaintiff has the burden of establishing personal jurisdiction."). When, as here, the district court finds personal jurisdiction lacking based on the complaint and affidavits, we review the court's dismissal de novo, taking as true all well-pleaded facts alleged in the complaint.  *Dudnikov*, 514 F.3d at 1070 ("[A]ny factual disputes in the parties' affidavits must be resolved in plaintiffs' favor.").  And at this early stage in the litigation, in the absence of an evidentiary hearing, the Entities need only make a prima facie showing of personal jurisdiction.  *See OMI Holdings, Inc. v. Royal Ins. Co. of Can.*, 149 F.3d 1086, 1091 (10th Cir. 1998) ("When a district court rules on a Fed. R. Civ. P. 12(b)(2) motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing . . . the plaintiff need only make a prima facie showing of personal jurisdiction to defeat the motion.").  In other words, the plaintiff may defeat a

14

motion to dismiss by presenting evidence—either uncontested allegations in its complaint or evidence in the form of an affidavit or declaration—"that if true would support jurisdiction over the defendant." *XMission*, 955 F.3d at 839 (quoting *OMI Holdings*, 149 F.3d at 1091).

**B**

"Where a federal lawsuit is based on diversity of citizenship, the court's jurisdiction over a nonresident defendant is determined by the law of the forum state." *Marcus Food Co. v. DiPanfilo*, 671 F.3d 1159, 1166 (10th Cir. 2011). Ordinarily, a plaintiff seeking to establish personal jurisdiction over an out-of-state defendant must show both that the exercise of jurisdiction is sanctioned by the state's long-arm statute and that it comports with the requirements of due process under the Fourteenth Amendment. *See Emps. Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1159 (10th Cir. 2010) ("To obtain personal jurisdiction over a nonresident defendant in a diversity action, a plaintiff must show that jurisdiction is legitimate under the laws of the forum state and that the exercise of jurisdiction does not offend the due process clause of the Fourteenth Amendment." (quoting *TH Agric. & Nutrition, LLC v. Ace Eur. Grp. Ltd.*, 488 F.3d 1282, 1286–87 (10th Cir. 2007))); *accord Marcus Food*, 671 F.3d at 1166 ("The party seeking to establish personal jurisdiction over a foreign litigant must make two showings: first, that the exercise of jurisdiction is sanctioned by the

state's long-arm statute; and second, that it comports with the due process requirements of the Fourteenth Amendment.").

Because Wyoming's long-arm statute confers jurisdiction "on any basis not inconsistent with the Wyoming or United States constitution," Wyo. Stat. Ann. § 5-1-107(a), the "statute extends state court jurisdiction in Wyoming to the constitutionally permissible limit." *Shanks v. Westland Equip. and Parts Co.*, 668 F.2d 1165, 1167 (10th Cir. 1982). Accordingly, "the first, statutory, inquiry effectively collapses into the second, constitutional, analysis" of whether personal jurisdiction comports with due process. *Anzures v. Flagship Rest. Grp.*, 819 F.3d 1277, 1279 (10th Cir. 2016) (quoting *Dudnikov*, 514 F.3d at 1070); *accord Rusakiewicz v. Lowe*, 556 F.3d 1095, 1100 (10th Cir. 2009). In other words, the Kennedy Entities' ability to establish personal jurisdiction depends entirely on whether a Wyoming court's exercise of personal jurisdiction over Mr. Jayson comports with due process.

Consistent with due process, a court may exercise specific personal jurisdiction[8] over a non-resident defendant only when that defendant has the requisite "minimum contacts" with the forum state, such that having to defend the lawsuit there would not "offend 'traditional notions of fair play and substantial

---

[8]    The Kennedy Entities do not contend that the Wyoming district court had general jurisdiction over Mr. Jayson; the relevant inquiry in that context is whether a defendant was "essentially at home" in a forum state. *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, --- U.S. ----, 141 S. Ct. 1017, 1024 (2021) (quoting *Goodyear Dunlop Tires Ops., S.A. v. Brown*, 564 U.S. 915, 919 (2011)).

16

justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting

*Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).  "Because a state's sovereignty is

territorial in nature, a defendant's contacts with the forum state must be sufficient

such that, notwithstanding [the defendant's] lack of physical presence in the state,

the state's exercise of sovereignty over [the defendant] can be described as fair

and just."  *Dudnikov*, 514 F.3d at 1070.

The Supreme Court has explained that these rules "derive from and reflect

two sets of values—treating defendants fairly and protecting 'interstate

federalism.'"  *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, --- U.S. ----, 141

S. Ct. 1017, 1025 (2021) (quoting *World-Wide Volkswagen Corp. v. Woodson*,

444 U.S. 286, 293 (1980)).  A defendant thus may be subject to personal

jurisdiction when it has "'fair warning'—[that is,] knowledge that 'a particular

activity may subject [it] to the jurisdiction of a foreign sovereign.'"  *Id.* (second

alteration in original) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462,

472 (1985)); *see also XMission*, 955 F.3d at 839–40 ("[T]he contacts with the

forum State must be such that the defendant 'should reasonably anticipate being

haled into court there.'" (quoting *World-Wide Volkswagen,* 444 U.S. at 297)).

Further, "States with 'little legitimate interest' in a suit" are not permitted to

"encroach" on sovereigns that are "more affected by the controversy."  *Ford*

*Motor Co.*, 141 S. Ct. at 1025 (quoting *Bristol-Myers Squibb Co. v. Super. Ct. of*

*Cal.*, --- U.S. ----, 137 S. Ct. 1773, 1780 (2017)).

To give effect to these principles—and, in doing so, to determine whether these requisite minimum contacts exist—we "focus[] on the nature and extent of 'the defendant's relationship to the forum State.'" *Id.* at 1024 (quoting *Bristol-Myers*, 137 S. Ct. at 1779). "[T]he Supreme Court has instructed that the 'minimum contacts' standard requires, first, that the out-of-state defendant must have 'purposefully directed' its activities at residents of the forum state, and second, that the plaintiff's injuries must 'arise out of' [a] defendant's forum-related activities." *Dudnikov*, 514 F.3d at 1071 (quoting *Burger King*, 471 U.S. at 472); *accord XMission*, 955 F.3d at 840.

If a court determines that the minimum contacts standard is satisfied, it next assesses whether "exercising personal jurisdiction over defendants" would otherwise "be consonant with traditional notions of fair play and substantial justice," in order to fully satisfy due process requirements. *Dudnikov*, 514 F.3d at 1071 (citing *Int'l Shoe Co.*, 326 U.S. at 316); *see also OMI Holdings*, 149 F.3d at 1091 ("[I]f the defendant's actions create sufficient minimum contacts, we must *then* consider whether the exercise of personal jurisdiction over the defendant offends 'traditional notions of fair play and substantial justice.'" (emphasis added) (quoting *Asahi Metal Indus. Co. v. Superior Ct. of Cal.*, 480 U.S. 102, 113 (1987))). Here, "[b]ecause we [ultimately] conclude that [Mr. Jayson] do[es] not have the minimum contacts necessary to support the exercise of specific jurisdiction over [him] in [Wyoming], we need not determine whether

18

the exercise of personal jurisdiction over [Mr. Jayson] would 'offend traditional notions of fair play and substantial justice.'" *Anzures*, 819 F.3d at 1282 (quoting *Int'l Shoe Co.*, 326 U.S. at 316).

## C

To assess the merit of the Kennedy Entities' arguments—and, more specifically, to determine whether they have satisfied the purposeful direction standard concerning Mr. Jayson's conduct—we apply what is known as the *Calder* "effects" test.[9] This test analyzes whether an out-of-state defendant's

---

[9] Although Mr. Jayson posits that we should apply a contract-based test for personal jurisdiction because this case involves a contract dispute, *see* Aplee.'s Resp. Br. at 26–27, our precedent suggests that the effects test is the correct test to use in the context of business torts committed by an out-of-state defendant. *See, e.g.*, *Anzures*, 819 F.3d at 1280 (evaluating tort claims under the effects test notwithstanding the parties' contractual relationship); *Niemi v. Lasshofer*, 770 F.3d 1331, 1348 (10th Cir. 2014) (same); *cf. Dental Dynamics, LLC v. Jolly Dental Grp., LLC*, 946 F.3d 1223, 1229 & n.3 (10th Cir. 2020) (reasoning that "purposeful availment" and "purposeful direction" are interchangeable terms, while applying the effects test to tort-based claims in a mixed tort and contract case). In any event, the Entities bear the burden of proof on the jurisdictional question, *see XMission*, 955 F.3d at 839, and they have elected to rely on the tort-based effects test on appeal, *see* Aplts.' Opening Br. at 22; *see also* Aplts.' App., Vol. II, at 256–260 (Opp'n to Mot. to Dismiss, filed Oct. 25, 2019) (repeatedly citing to effects-test cases, such as *Dudnikov* and *Newsome v. Gallacher*, 722 F.3d 1257 (10th Cir. 2013), to support their theory of personal jurisdiction). Accordingly, it is appropriate for us to focus on their theory for jurisdictional relief—and also to concomitantly hold them to the consequences of that choice. *See Dudnikov*, 514 F.3d at 1071 ("While we do not imagine that *Calder* necessarily describes the only way to satisfy the purposeful direction test, because plaintiffs assert it provides the key to unlocking the courthouse door for them, we are able to limit our attention in this case to *Calder*'s demands."); *cf. Raley v. Hyundai Motor Co.*, 642 F.3d 1271, 1275 (10th Cir. 2011) ("Where an appellant fails to lead, we have no duty to follow. It

(continued...)

tortious conduct satisfies three elements: "(1) an intentional action; (2) expressly aimed at the forum state; and (3) . . . knowledge that the brunt of the injury would be felt in the forum state." *Dental Dynamics, LLC v. Jolly Dental Grp., LLC*, 946 F.3d 1223, 1231 (10th Cir. 2020); *see also Grynberg v. Ivanhoe Energy, Inc.*, 490 F. App'x 86, 96 (10th Cir. 2012) (unpublished) ("One way to conduct [the purposeful direction] analysis in tort cases is to consider the 'effects test' of *Calder v. Jones . . . .*").[10]

As the proponent of jurisdiction, plaintiffs must demonstrate each element of the effects test to satisfy the purposeful direction standard; that is, plaintiffs' failure to establish even one of the elements will doom their showing of purposeful direction. *See Shrader v. Biddinger*, 633 F.3d 1235, 1239 (10th Cir. 2011) (noting that the three elements "together indicate 'purposeful direction'"); *accord Pakootas v. Teck Cominco Metals, Ltd.*, 905 F.3d 565, 577 (9th Cir. 2018) ("We construe *Calder* as imposing three requirements . . . .").

---

[9](...continued)
is the appellant's burden, not ours, to conjure up possible theories to invoke our legal authority to hear her appeal."). And, limiting our focus to the effects test permits us to avoid being distracted by the merits, or lack thereof, of other potential theories of minimum contacts.

[10]    We recognize that this unpublished case is not binding on us. We nevertheless find the case persuasive and helpful to our analysis and, therefore, we elect to employ it here. *See, e.g.*, *United States v. Engles*, 779 F.3d 1161, 1162 n.1 (10th Cir. 2015).

With these governing legal principles in mind, we proceed to assess the Kennedy Entities' arguments regarding why the Wyoming federal court purportedly erred in determining that it lacked personal jurisdiction over Mr. Jayson.

## III

On appeal, the Kennedy Entities argue that the district court had jurisdiction over Mr. Jayson because he purposefully directed his tortious conduct at Wyoming, thus establishing the requisite minimum contacts. They contend that we should reverse the court's ruling to the contrary. Further, they urge us to complete the jurisdictional analysis by holding that the Entities' injuries arise out of Mr. Jayson's contacts with Wyoming, and that the district court's exercise of personal jurisdiction over Mr. Jayson would not offend traditional notions of fair play and substantial justice.

However, we cannot give the Entities what they want. Our minimum contacts analysis in this case ends with our determination that the Entities have not made a prima facie showing that Mr. Jayson purposefully directed his allegedly tortious conduct at Wyoming. More specifically, we conclude that they have not made an adequate showing that Mr. Jayson expressly aimed his conduct at the forum state. *See, e.g.*, *Dental Dynamics*, 946 F.3d at 1231–32. Not uncommonly, our decisions have ended the *Calder* effects analysis after holding that the plaintiffs have failed to meet the second, express aiming, element of the

21

test. *See, e.g., id.* at 1232 (omitting any discussion regarding *Calder*'s third prong where the plaintiff failed to show defendant had expressly aimed its conduct at the forum); *Anzures*, 819 F.3d at 1281–82 (holding, as to the tort claims, that the plaintiff failed to establish that the defendant's conduct was expressly aimed at the forum and effectively ending the inquiry there); *see also Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 807 n.1 (9th Cir. 2004) (noting "[b]ecause Schwarzenegger has failed to sustain his burden with respect to the second part of the *Calder* effects test, we need not, and do not, reach the third part of the test").[11]  We follow this route here.

## A

The first *Calder* element—an "intentional action" by the defendant—"requires little discussion." *See Newsome v. Gallacher*, 722 F.3d 1257, 1268 (10th Cir. 2013).  The Entities adequately alleged—as the district court concluded—that Mr. Jayson undertook intentional tortious action. *See, e.g.*, Aplts.' App., Vol. I, ¶¶ 29–75, at 12–25 (describing Mr. Jayson's allegedly erroneous material statements and omissions about CRUPE to induce the Entities

---

[11]    We have repeatedly referenced *Schwarzenneger* as persuasive in our own express aiming precedent.  *See Dudnikov*, 514 F.3d at 1076 (citing to *Schwarzennegger* as "[i]nformative in its contrast" and comparing *Schwarzenneger* to the case before it); *see also Newsome*, 722 F.3d at 1268–69 (citing two Ninth Circuit cases, including *Schwarzenneger*, as "cases [that] help to illustrate the contours of" the "focal point" requirement); *see Grynberg*, 490 F. App'x at 98 (observing how the *Dudnikov* court "instructively compared two decisions of the [Ninth Circuit]," including *Schwarzenegger*).

to invest in CRUPE IP, and recounting the $10 million invested in CRUPE to the detriment of the Entities); *Eighteen Seventy*, 532 F. Supp. 3d at 1138 (noting that the Entities "generally alleg[ed] Mr. Jayson 'stood silent' while actions detrimental to investors were taken and 'failed to disclose' certain information material to investors").

And although Mr. Jayson "adamantly denies the salacious allegations set forth in the Kennedy Entities' complaint," he concedes that "the district court correctly applied the standard," that "those allegations must be considered [if they are] plausible, non-conclusory, and non-speculative," and that "it is unnecessary . . . to take the Court's time" to argue "why the Kennedy Entities cannot meet [this] first element." Aplee.'s Resp. Br. at 33–34. Because this first element is easily met, we turn to the second element. *See, e.g.*, *Dudnikov*, 514 F.3d at 1073 (noting allegations of an intentional tortious act satisfy the first *Calder* element); *Newsome*, 722 F.3d at 1268 (same). And that is where the Kennedy Entities confront an insurmountable obstacle.

**B**

**1**

Under *Calder*'s second prong, a defendant's allegedly tortious actions must be "expressly aimed" at the forum state. *Calder*, 465 U.S. at 789. In determining whether a defendant expressly aimed his conduct at the forum state, "*a plaintiff's* contacts with the defendant and forum" cannot "drive the jurisdictional analysis."

23

*Walden v. Fiore*, 571 U.S. 277, 289 (2014) (emphasis added).  Rather, the forum state must be the "focal point" of *the defendant's* tortious conduct.  *Newsome*, 722 F.3d at 1268.  Stated differently, "*the defendant's* conduct [must] connect[] him to *the forum* in a meaningful way."  *Walden*, 571 U.S. at 290 (emphases added).

Two Supreme Court decisions mark the guideposts by which we must evaluate whether Mr. Jayson "expressly aimed" his conduct at Wyoming.  The first is *Calder* itself.  In *Calder*, actress Shirley Jones sued a Florida-based editor and writer based on an allegedly libelous article they had written in Florida about her for the *National Enquirer*, which was published nationwide, including in California.  *See Calder*, 465 U.S. at 784–86.  The writer and the editor challenged the California court's exercise of personal jurisdiction, emphasizing that they had few contacts with California despite the *Enquirer*'s national distribution, and that the article was written and edited in Florida, not California.  *See id.*

But the Supreme Court held that the California court could appropriately exercise personal jurisdiction over the defendants because "their intentional, and allegedly tortious, actions were expressly aimed at California."  *Id.* at 789.  The Court highlighted that "[the writer] wrote and [the editor] edited an article that they knew would have a potentially devastating impact upon respondent [that is,

24

Ms. Jones]" in California.[12]  *Id.* at 789–90.  And, in *Dudnikov*, we underscored that the *Calder* Court's express aiming holding rested on the fact that "the article was about a California resident and her activities in California; [and] likewise it was drawn from California sources and widely distributed in that state."  514 F.3d at 1072.

Twenty years later, the Court elaborated on the purposeful direction requirement and, as particularly relevant here, further defined the contours of the express aiming requirement.  In *Walden v. Fiore*, a Georgia law enforcement officer improperly seized almost $97,000 in gambling winnings from a couple at the Atlanta airport as they waited to board their next flight.  571 U.S. at 279–80.  The couple, who were passing through the Atlanta airport to get to their final destination in Nevada, later filed a tort suit in Nevada against the police officer.  *Id.* at 280–81.

---

[12]    Notably, in the same passage of *Calder*, the Court elaborated on the point about the defendants' knowledge of the adverse impact of their actions, stating that they "knew that the brunt of th[e] injury would be felt by respondent in" California, "the State in which she lives and works."  *Calder*, 465 U.S. at 789–90.  We recognized in *Dudnikov* that there "is some overlap between this [express aiming] test and *Calder*'s additional requirement"—that the defendant know that the brunt of the injury would be felt in the forum state.  514 F.3d at 1074–75.  But we stressed that "the overlap is far from complete": specifically, we observed that "the 'express aiming' test focuses more on a defendant's intentions—[i.e.,] where was the 'focal point' of its purposive efforts—while the latter requirement concentrates on the consequences of the defendant's actions—[i.e.,] where was the alleged harm actually felt by the plaintiff."  *Id.* at 1075.  This overlap is evident in our analysis *infra* but we center our attention on Mr. Jayson's intentions with respect to contacts with the forum.

Considering whether the Nevada federal court had personal jurisdiction over the officer, the Supreme Court reversed the Ninth Circuit, which had held that the district court had personal jurisdiction because the police officer had tortiously acted with the knowledge that his conduct would affect persons with significant Nevada connections. *Id.* at 282. The Court took issue with the Ninth Circuit's reliance on the *plaintiffs'* residence and forum connections, reasoning that "[r]ather than assessing [the officer's] own contacts with Nevada, the Court of Appeals looked to [the officer's] knowledge of [the plaintiffs'] 'strong forum connections.'" *Id.* at 289 (quoting *Fiore v. Walden*, 688 F.3d 558, 577–79, 581 (9th Cir. 2012)). But "[t]his approach to the 'minimum contacts' analysis impermissibly allows a plaintiff's contacts with the defendant and forum to drive the jurisdictional analysis." *Id.*

The Court explained that "when viewed through the proper lens—[that is,] whether the *defendant's* actions connect him to the *forum*—[the defendant-officer] formed no jurisdictionally relevant contacts with Nevada." *Id.* Crucially, the Court held that the officer's "actions in Georgia did not create sufficient contacts with Nevada simply because he allegedly directed his conduct at plaintiffs whom he knew had Nevada connections." *Id.* In the Court's view, "[s]uch reasoning improperly attributes a plaintiff's forum connections to the defendant and makes those connections 'decisive' in the jurisdictional analysis,"

26

despite "the reality that none of [the officer's] challenged conduct had anything to do with Nevada itself." *Id.*

*Calder* and *Walden* thus provide helpful principles in assessing when it is appropriate to exercise jurisdiction over an out-of-state defendant. On one hand, *Calder* makes clear that a defendant need not be physically present in a state to have "expressly aimed" his conduct there. *See Calder*, 465 U.S. at 785–86, 789 (holding a California court had personal jurisdiction over individual defendants when the defendants had not visited the state in connection with an allegedly defamatory article and "[we]re not responsible for the circulation of the article in California"); *see also Newsome*, 722 F.3d at 1269 (holding that an Oklahoma court had personal jurisdiction over individual defendants who had not visited the state when they breached their fiduciary duty to a subsidiary that they knew "operated exclusively" in Oklahoma); *Dudnikov*, 514 F.3d 1075–76 (holding that a Colorado court had personal jurisdiction over a defendant despite "the lack of defendants' physical presence in Colorado" because they acted "with the ultimate purpose of cancelling plaintiffs' auction in Colorado").

On the other hand, *Walden*—as well as our subsequent cases—have made plain that a defendant's knowledge of *a plaintiff's* connection to a forum state, without more, cannot establish express aiming towards the forum state. *See Walden*, 571 U.S. at 289 ("Petitioner's actions in Georgia did not create sufficient contacts with Nevada simply because he allegedly directed his conduct at

27

plaintiffs whom he knew had Nevada connections.  Such reasoning improperly attributes a plaintiff's forum connections to the defendant and makes those connections 'decisive' in the jurisdictional analysis."); *see also Rockwood Select Asset Fund XI (6)-1, LLC v. Devine, Millimet & Branch*, 750 F.3d 1178, 1180 (10th Cir. 2014) ("*Walden* teaches that personal jurisdiction cannot be based on interaction with a plaintiff known to bear a strong connection to the forum state.").

**2**

Mr. Jayson's nexus to the forum state, Wyoming, rests between the points on the continuum that *Calder* and *Walden* mark.[13]  The Kennedy Entities contend that Mr. Jayson expressly aimed his conduct at Wyoming because his connections go well beyond the "single out-of-forum event" described in *Walden*.  Aplts.' Opening Br. at 31.  They argue that Mr. Jayson's "tortious conduct involved years of forum-directed investment cultivation, his negotiation and approval of loans (including one referenced during a board meeting as 'Eighteen Seventy, Wyoming'), as well as his review and/or signing of documents (including nearly

---

[13]     Though the district court here concluded that *Walden* was "dispositive" in establishing that it lacked personal jurisdiction over Mr. Jayson, *see Eighteen Seventy*, 532 F. Supp. 3d at 1138, we do not believe that the facts of this case militate as strongly as they did in *Walden* against a finding of personal jurisdiction.  Nevertheless, *Walden* is quite instructive in answering the personal jurisdiction question before us.  And, ultimately, our more restrained view regarding *Walden*'s impact on this case does not prevent us from upholding the district court's judgment dismissing this action against Mr. Jayson for lack of personal jurisdiction.

28

half a dozen contracts) in which [the Entities'] Big Horn, Wyoming address was prominently and repeatedly displayed." *Id.* at 34.

However, Mr. Jayson responds that the Entities have failed to meet the "express aiming" standard, because "they identify conduct that is tenuously connected to Wyoming." Aplee.'s Resp. Br. at 36. He contends that "[i]t cannot reasonably be considered that [his] work in Switzerland with CRUPE on the Information Memorandum [i.e., Confidential Memorandum], the Investment Agreement, and other agreements," some of which were prepared "before the Kennedy Entities came on the scene" could have been done "with Wyoming as his focal point." *Id.* He also takes issue with "the Kennedy Entities['] attempt to conflate [his] . . . actions with those of Mr. Robertson and Mr. Bihrer," whom he asserts had much more substantial contact with the Kennedy Entities. *Id.* at 37.

In substance, we believe that Mr. Jayson has the better of this dispute. Although the Kennedy Entities argue *Walden* is distinguishable because "the underlying and alleged wrongful conduct in this case was, from the beginning, of *direct consequence to the plaintiffs* in the forum," Aplts.' Opening Br. at 31 (emphasis added), we believe that the Entities' express aiming argument places undue emphasis on the fact that *their* principal place of business is in the forum. Crucially, "*Calder* made clear that mere injury to a forum resident is not a sufficient connection to the forum." *Walden*, 571 U.S. at 290. As *Walden* further reasoned, "the mere fact that [the defendant's] conduct affected plaintiffs with

29

connections to the forum State does not suffice to authorize jurisdiction." *Id.*
at 291; *see Rush v. Savchuk*, 444 U.S. 320, 332 (1980) (noting that "plaintiff's
contacts with the forum [could not be] decisive in determining whether the
defendant's due process rights are violated").

Finding clear guidance regarding the express aiming factor in the Supreme
Court's seminal case, *Calder*, our precedent has zeroed in on whether "the forum
state itself . . . [is] the 'focal point of the tort.'" *Dudnikov*, 514 F.3d at 1074 &
n.9 (quoting *Far W. Cap., Inc. v. Towne*, 46 F.3d 1071, 1080 (10th Cir. 1995));
*accord Anzures*, 819 F.3d at 1281–82; *Newsome*, 722 F.3d at 1268; *see also
Calder*, 465 U.S. at 789 (noting in finding personal jurisdiction in plaintiff's libel
action, that "California is the focal point both of the story and of the harm
suffered"). In other words, we have centered the express aiming analysis on
whether the defendant's allegedly tortious conduct was focused on or directed at
the forum state—not, as the Entities would seemingly have it, on whether the
defendant's wrongful conduct was focused on or directed at the interests of
plaintiffs who reside in or otherwise have significant connections to the forum
state.

As a consequence of our "somewhat . . . restrictive approach" regarding
this focal point analysis, to the extent practicable, we ensure, as due process
demands, that "an out-of-state defendant is not bound to appear to account for
merely 'random, fortuitous, or attenuated contacts' with the forum state."

30

*Dudnikov*, 514 F.3d at 1071, 1074 n.9 (quoting *Burger King*, 471 U.S. at 475).

And even the Entities do not question the importance of this objective. *See*

Aplts.' Opening Br. at 28 (noting that "the overriding 'purposeful direction'

inquiry . . . [is] whether [Mr.] Jayson is being called 'to account for merely

random, fortuitous, or attenuated contacts with the forum state'" (quoting

*Dudnikov*, 514 F.3d at 1071)).

The problem for the Entities, however, is that, based on the record

evidence, we cannot help but conclude that Wyoming was not the focal point for

Mr. Jayson's allegedly tortious conduct and, relatedly, that his personal dealings

with the Entities were far too attenuated to warrant the exercise of personal

jurisdiction over him. Consequently, the Entities are unable to make a sufficient

showing of the express aiming requirement.

What follows is our explication of the foundation for this conclusion. First,

we discuss some of our key cases that illustrate the circumstances in which we

have determined—expressly or in so many words—that the forum state was the

focal point for the defendants' allegedly tortious conduct, as well as cases in

which the proof of such a focal point was wanting. And then we explain why the

legal principles and facts of these cases make clear that Mr. Jayson's allegedly

tortious conduct does not provide an adequate foundation for the Entities to

satisfy the express aiming requirement.

31

**a**

In *Dudnikov*, we held that the federal district court in Colorado had personal jurisdiction over two defendants—a British company and its Connecticut-based corporate agent—that halted the plaintiffs' Colorado business from hosting an eBay auction of its fabric prints online. *See* 514 F.3d at 1082. The defendants—alleged owners of the copyright of a work that the plaintiffs' business was reproducing—filed a notice of claimed infringement with eBay against the business. *See id.* at 1069. Their actions led eBay to halt the Colorado company's auction. *See id.* One of the owners of the Colorado business contacted the defendants requesting that they withdraw the notice—explaining that she made her "living" on eBay and that the notice "put[] [her Colorado] business in danger of going under." *Id.* In response, the defendants threatened to sue if the auction were reinstated. *See id.* As relevant here, we held that the defendants—even though acting through their third-party contact with eBay—had targeted Colorado because their "express aim in acting was to halt a Colorado-based sale by a Colorado resident." *Id.* at 1076. We noted that, as alleged, the defendants "*intended* their extra-forum conduct to reach and affect plaintiffs' business operations in Colorado." *Id.*

*Dudnikov* thus provides useful guidance regarding the circumstances under which it may be said that the "focal point" of a defendant's tortious conduct was the forum state. There, the defendants had notice that the plaintiffs' business

32

activities related to the defendants' alleged infringement claim—that is, selling crafts in online auctions—were anchored in the forum state. *See id.* at 1068. And, yet, they acted with the allegedly tortious intent to disrupt or impair those forum-based activities. *See id.* at 1076.

These circumstances stand in stark contrast to those where we effectively determined that the forum state was not the focal point of the defendants' wrongful conduct.[14] For example, in *Anzures*, we held that a Colorado plaintiff's fraud and misrepresentation claims against two out-of-state defendants could not satisfy the express aiming element when the defendants never *targeted* Colorado.

---

[14]    The Ninth Circuit's decision in *Schwarzenegger* also helps to illustrate the circumstances where the forum state reasonably cannot be said to be the focal point of the defendant's wrongful conduct. *See* 374 F.3d at 807. As we described the case in *Dudnikov*, in *Schwarzenegger*, an Ohio car dealership used a photograph of Arnold Schwarzenegger—a well-known actor and star of *The Terminator* movie—in its local advertisements, without his permission, to encourage potential buyers to "terminate" their current car lease and acquire a new vehicle from the dealership. *Dudnikov*, 514 F.3d at 1076. Mr. Schwarzenegger sued the Ohio car dealership in California for the unauthorized use of his photograph. *Id.* But "the Ninth Circuit refused jurisdiction, stressing that, unlike the defendants in *Calder*, the car dealership's advertisements were not 'expressly aimed' at Mr. Schwarzenegger in the forum state (California)." *Id.* (quoting *Schwarzenegger*, 374 F.3d at 807). In *Dudnikov*, we effectively interpreted *Schwarzenegger* as involving insufficient "focal point" evidence because "[w]hile [the dealership owner] perhaps *knew* Mr. Schwarzenegger lived in California, this was insufficient to convey jurisdiction there because the *intentions* behind his advertisement w[ere] solely to entice local market Ohioans, not Californians, 'to buy or lease cars from [the dealership owner].'" *Id.* That is, the dealership owner's intentions were to influence the market conduct of Ohioans—not the conduct of those in California, the forum state; it was of no major significance that the dealer arguably knew that the photographic subject of his advertisement, Mr. Schwarzenegger, resided in California.

*See Anzures*, 819 F.3d at 1281.  The plaintiff had entered into a business venture with two Nebraska-based defendants, forming a Nevada LLC with a principal place of business in Nebraska.  *Id.* at 1278–79.  The relationship later soured, and the plaintiff sued the defendants in Colorado for allegedly attempting to "squeeze" him out of the company.  *Id.* at 1279.

Relying on *Walden*—and distinguishing *Calder* and *Dudnikov*—we concluded that the Colorado court lacked personal jurisdiction over the defendants because "the facts of record d[id] not show that either defendant expressly aimed any conduct at Colorado" as part of the torts in question, which involved "the formation . . . or ownership structure" of the company, "or the reduction of [the plaintiff's] compensation."  *Id.* at 1281.  Because the torts lacked a "focal point" in Colorado, "the fact that [the plaintiff] was affected in Colorado (because he resides there) [was] insufficient to authorize personal jurisdiction over defendants."  *Id.* at 1281–82.

Importantly, our resolution of the express aiming question in one case—*Newsome*—helps to demarcate the circumstances where we have determined, on the one hand, that the forum state was the "focal point" of defendants' tortious conduct from those, on the other hand, where we have reached the opposite determination.  That is because, in *Newsome*, we had the occasion to determine that the district court properly exercised jurisdiction over some defendants but not others: specifically, we held that certain Canadian

34

corporate executives expressly aimed their tortious behavior at a forum but a Canadian law firm did not.

In particular, we addressed whether a Canadian-owned natural gas company, Mahalo USA, which was "operating *exclusively* in Oklahoma[,] [could] sue the corporation's Canadian officers and directors in Oklahoma." *Newsome*, 722 F.3d at 1261 (emphasis added). The Canadian officers and directors sat on the Board of Mahalo USA's Canadian parent, and some of them were also directors or officers of Mahalo USA itself. They were accused of "conspir[ing] to maximize their own profits by shifting unsustainable debt to" the Oklahoma-based corporation—thereby, breaching their fiduciary duties. *Id.* at 1262. The individual defendants—several of whom had never traveled to Oklahoma—argued that they could not be subject to the personal jurisdiction of the Oklahoma court. *See id.* at 1263. We determined otherwise, asserting that "the individual defendants do not contest that they knew [the corporation] operated *exclusively* in Oklahoma, making Oklahoma the focal point of any tort against [the corporation] they may have committed." *Id.* at 1269 (emphasis added). Consequently, we reasoned that the individual defendants had "expressly aimed" their actions at Oklahoma when they allegedly breached fiduciary duties towards a corporation that they knew was exclusively operating its related business in Oklahoma. *Id.*

It bears underscoring that a central factor in our express aiming analysis in *Newsome* was not simply that the company had its headquarters in Oklahoma;

35

instead, it was the fact that the company exclusively operated its business activities related to the Canadian parent in Oklahoma. From this, we could reasonably infer that, when the defendants allegedly intended to engage in wrongful conduct that would be harmful to the company's business operations related to the Canadian parent, they necessarily intended for the focal point of their wrongful conduct to be Oklahoma. In other words, as in *Dudnikov*, we determined that a group of defendants had notice that the harmed business's activities implicating the defendants were centered in the forum state. *See id.* at 1262–63. Yet, they nevertheless acted with allegedly tortious intent to alter or disrupt those forum-based activities. *See id.* at 1268–69 (holding the defendants intended to transfer debt to a company that exclusively operated its business activities related to the defendants in Oklahoma).

Significantly, we reached the opposite conclusion as to another defendant in *Newsome*. We distinguished the corporate officers who made Oklahoma the focal point of their tortious conduct from the Canadian law firm that had facilitated the debt-shifting transaction. In particular, we observed that "an out-of-state attorney working from out-of-state on an out-of-state matter does not purposefully avail himself of the client's home forum's laws and privileges, at least not without some evidence that the attorney reached out to the client's home forum to solicit the client's business." *Id.* at 1280–81. And we acknowledged that the Canadian law firm defendant "never reached out to Mahalo USA in

36

Oklahoma to solicit its business, but instead . . . represent[ed] its Canadian parent company in Canada." *Id.* at 1281. We noted that, as alleged, the law firm's sole tortious acts had been to "'facilitat[e]' the placement of liens on Oklahoma property and receiv[e] payments from Mahalo USA's Oklahoma bank accounts." *Id.* This was not enough to satisfy the express aiming requirement.

We held that "the firm did not purposefully direct its efforts at Mahalo USA in Oklahoma." *Id.* Significantly, we should highlight that this is not a situation where the law firm's interactions with Mahalo USA's affairs and the forum were non-existent; indeed, the firm's actions helped to facilitate the wrongful conduct of the Canadian corporate officers and directors as to which the court did have personal jurisdiction. However, we effectively determined that the law firm's contacts with the forum were too attenuated to support an exercise of personal jurisdiction. And we tacitly implemented a vision of the express aiming requirement that was substantially congruent with the one adopted a year later by the Supreme Court in *Walden*—which, as we have noted, reasoned that "the mere fact that [the defendant's] conduct affected plaintiffs with connections to the forum State does not suffice to authorize jurisdiction." 571 U.S. at 291.

**b**

Guided by the legal principles and illustrative facts of the foregoing cases—as augmented by our other relevant decisions—we conclude that the focal point of Mr. Jayson's allegedly tortious acts clearly was not Wyoming and,

37

relatedly, that any contacts by Mr. Jayson with Wyoming were too attenuated to allow a court to exercise jurisdiction over him.  Accordingly, we conclude that the Entities cannot satisfy the express aiming requirement.

The Kennedy Entities' complaint asserts that Mr. Jayson, through his work for CRUPE, "transacted business within the United States and within the State of Wyoming . . . that caused harm to Plaintiffs" by "making continuous securities offerings in the United States and in the State of Wyoming . . . [which] were sold to investors in Wyoming *and elsewhere in the United States*."  Aplts.' App., Vol. I, ¶¶ 20–21, at 9 (emphasis added).  Indeed, CRUPE solicited investors worldwide.  *See id.*, Vol. II, at 381 (showing investors located in St. Lucia, the British Virgin Islands, Hong Kong, Switzerland, the United Kingdom, and Singapore).

Even giving full weight to the Kennedy Entities' contention that they "were CRUPE's primary funder and repeat lender," Aplts.' Reply Br. at 23, it is clear to us that Mr. Jayson's purported aim was to encourage and induce (allegedly through deceit) sustained investments in his foreign company through, in essence, geographically undirected solicitations; the fact that the Kennedy Entities were especially taken with CRUPE's business plan and invested more than others did not alter the nature of Mr. Jayson's intentions.  He did not intend for Wyoming to be the focal point of his allegedly tortious conduct.  Indeed, there was nothing unique about the Kennedy Entities, much less Wyoming, that led Mr. Jayson to

38

prepare fraudulent materials or withhold information about CRUPE.  Thus, "[t]he jurisdictional analysis of [the Entities'] tort claims is distinguishable from that in *Calder* and *Dudnikov*, . . . [because i]n each of those cases, it was not only important that the plaintiff felt the effects of the defendants' actions in the forum state but that the defendants' actions targeted the forum state."  *Anzures*, 819 F.3d at 1281.

And the lack of evidence of a meaningful nexus between the Kennedy Entities' CRUPE-related business and the forum state of Wyoming only serves to bolster our conclusion that Mr. Jayson could not have expressly aimed his allegedly wrongful conduct at Wyoming.  Despite the Kennedy Entities' assertions that the "business end of the transactions," took place in Wyoming, Aplts.' Opening Br. at 31 (quoting *Benton v. Cameco Corp.*, 375 F.3d 1070, 1077 (10th Cir. 2004)), and the undisputed fact that their principal place of business was Wyoming, there are no averments that the Kennedy Entities' CRUPE investments had any meaningful connection to their business activities in Wyoming—much less averments permitting a plausible inference that Mr. Jayson would have been aware of any such Wyoming-CRUPE connections when he committed his tortious acts.  Indeed, the record is silent about whether the Kennedy Entities even had meaningful business activities in Wyoming—let alone business activities with a meaningful connection to their CRUPE investments.  *Cf. Far W. Cap.*, 46 F.3d at 1075–76 (rejecting contention that plaintiff's

establishment of an escrow account in Utah "is sufficient to provide minimum contacts" because "defendants could claim rights to funds in the Utah account and because they received royalties from this account" given that "at the time of the negotiations, there is no evidence that defendants even knew the account would be located in Utah" and therefore there was "no evidence that defendants purposefully availed themselves of Utah law by drawing royalties from the account").

In other words, there are no averments from which a reasonable inference could be drawn that, when Mr. Jayson allegedly sought through deceit to induce the Kennedy Entities to invest in CRUPE and its subsidiaries, he necessarily intended that his actions would affect any business operations of the Kennedy Entities in Wyoming with any significant connection to, or relationship with, CRUPE. *See, e.g.*, *Niemi v. Lasshofer*, 770 F.3d 1331, 1348–49 (10th Cir. 2014); *Dudnikov*, 514 F.3d at 1076. Stated otherwise, the record certainly does not permit a court to form a reasonable inference that Mr. Jayson knew about any such CRUPE-related business activities of the Kennedy Entities in Wyoming—much less harbored the intent to direct his wrongful conduct to Wyoming to adversely impact or disrupt such activities.

In addition to the contrast that *Dudnikov* and *Newsome* draw on this score, the circumstances of this case are markedly distinct from those in *Niemi v. Lasshofer*, where we concluded that the court properly exercised personal

40

jurisdiction over the defendants.  In *Niemi*, we held that a court in the forum state, Colorado, had personal jurisdiction over an individual and his affiliated companies that allegedly "perpetrated a fraudulent financing scheme that caused the collapse of [p]laintiffs' large-scale real estate development project in Breckenridge, Colorado."  770 F.3d at 1337.  We determined that the fraudulent scheme "was expressly aimed at Colorado" because the defendants "knew unquestionably" that they would be "participat[ing] in loans to entities in Colorado for the purpose of developing a resort at Breckenridge, Colorado."  *Id.* at 1348–49.  Although we recognized that the defendants knew that two of the plaintiffs were Colorado residents, like the district court, we concentrated in our jurisdictional analysis on "the project being in Colorado," and the defendants' understanding that "the loan funds were to be extended to and used in Colorado" and "the hardship being caused by the delay in the loan funding."  *Id.* at 1349.  In this regard, *Niemi*'s analysis is entirely compatible with *Dudnikov*, 514 F.3d at 1076, and *Newsome*, 722 F.3d at 1269, and the Supreme Court precedent that they rely on.  And its analysis underscores why it cannot be reasonably said that Mr. Jayson's allegedly tortious activities were expressly aimed at the forum state, Wyoming, when there is no meaningful evidence that Mr. Jayson was aware that his allegedly wrongful conduct would adversely impact or disrupt the Kennedy

41

Entities' business activities with any significant connection to CRUPE in Wyoming.[15]

Indeed, cases from our sister circuits involving investment-related personal jurisdiction issues apply, at least tacitly, similar reasoning, in that they zero in on whether the tortious activity targets investments in a forum state—thus making the forum state the focal point of the tortious activity. *See Kaliannan v. Liang*, 2 F.4th 727, 734 (8th Cir. 2021) (holding that defendants had sufficiently targeted North Dakota to establish personal jurisdiction, despite their meetings with plaintiffs occurring outside of the state, where "the communications—and 'investments' themselves—still *concerned North Dakota properties*" (emphasis added)), *cert denied*, --- U.S. ----, 142 S. Ct. 758 (2022); *cf. SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 345 (2d Cir. 2018) (holding that "a handful of communications and transfers of funds" between a plaintiff investor and defendant investment fund were "insufficient to allow the exercise of specific personal jurisdiction" because "'communications with and payments to New York merely to ensure compliance with contract terms negotiated and executed outside of New York do not "project" a defendant into the state sufficiently to confer'

_____

[15]     *See also Far W. Cap.*, 46 F.3d at 1080 (where, *inter alia*, "the most important negotiations took place in Nevada, and the enterprise was designed to use Nevada resources to supply power to a Nevada utility," noting that "[u]nlike *Calder*, . . . the focal point of this relationship was Nevada rather than Utah . . . [and] there is no indication that Utah had anything but a fortuitous role in the parties' past dealing or would have any role in their continuing relationship" (citation omitted)).

specific jurisdiction over foreign defendants" (quoting *Hau Yin To v. HSBC Holdings PLC*, No. 15-cv-3590, 2017 WL 816136, at *5 (S.D.N.Y. Mar. 1, 2017) (unpublished))).

To be sure, the Kennedy Entities seem to argue that we should infer that Mr. Jayson targeted Wyoming due to his sustained role in "prepar[ing] numerous financial documents that he himself either delivered or knew would be delivered to the Wyoming Entities with the goal of soliciting their funds." Aplts.' Reply Br. at 15. They contend that his actions—which purportedly were "far greater in number" than those found to establish personal jurisdiction in *Newsome* and *Dudnikov* and "spann[ed] a period of years"—were "conducted with the purpose of directly impacting a forum-state business." *Id.* at 23. More specifically, the Entities focus on Mr. Jayson's work in Switzerland with CRUPE on the Confidential Memorandum, the Investment Agreement, and other documents. They suggest that Mr. Jayson purposefully directed his activities towards Wyoming because he filled out forms that listed the Entities' physical Wyoming address, and knew that two of its partners were located in Wyoming. *See, e.g.*, Aplts.' App., Vol. I, ¶ 28, at 12 ("Accordingly, [Mr. Jayson] purposefully directed activity toward Wyoming through substantial and knowing contacts with Wyoming, the headquarters of . . . Eighteen Seventy and related entity the [Foundation] . . . .").

However, this argument does not dissuade us from our belief that any contacts by Mr. Jayson with Wyoming do not satisfy the express aiming requirement and, relatedly, were too attenuated to allow a court to properly exercise jurisdiction over him. Our decision in *Rockwood Select* especially hammers this point home. In *Rockwood Select,* we considered whether a Utah court could exercise personal jurisdiction over the New Hampshire law firm defendant where the plaintiff "informed [the law firm] that it was a limited liability company organized under Utah law," the law firm addressed an opinion letter to the plaintiff at a Utah location, and the plaintiff "relied on the opinion letter while in Utah and suffered injury there." 750 F.3d at 1180. We held that these connections were insufficient to establish personal jurisdiction over the law firm. *See id.*

First, we noted that under *Walden*, the plaintiff's "reliance on its own Utah connections [wa]s misguided," and we specifically rejected the plaintiff's argument that the law firm's "decision to address [an] opinion letter to . . . a Utah address" tilted the balance in favor of a finding of personal jurisdiction. *Id.* at 1180–81. We highlighted in this discussion our earlier decision in *Trierweiler v. Croxton & Trench Holding Corp.*, 90 F.3d 1523 (10th Cir. 1996). In *Trierweiler*, we held that the defendant lawyer "could not have reasonably foreseen being subjected to . . . jurisdiction" in the forum simply by preparing and

44

sending an opinion letter that turned up in the hands of the plaintiff in the forum. *Id.* at 1534.

We rejected the effort of the *Rockwood Select* plaintiff to distinguish *Trierweiler* on the ground that it was clear in its lawsuit that the lawyer defendant had addressed the opinion letter to it in Utah (the forum state), while the same could not be said for the defendant lawyer in *Trierweiler*. *Rockwood Select*, 750 F.3d at 1181 & n.2. We described this "distinction" as "immaterial" because "[r]egardless of how the opinion letter was addressed in *Trierweiler*, the plaintiff's allegation was that the letter was going to end up" in the "forum state" and the "law firm *knew that*." *Id.* at 1181 (emphasis added). And just as those circumstances were not enough of a hook for personal jurisdiction in *Trierweiler*, the *Rockwood Select* panel reasoned that it was not enough in the case before it that the defendant addressed the opinion letter to a location in the forum state. *Id.* at 1181–82. Further, the panel stressed that the plaintiff's "strong connection to Utah," the forum state, could not drive the jurisdictional analysis and shape our judgment regarding whether the defendant's activities were expressly aimed at the forum state. *Id.* at 1182. As in *Rockwood Select*, Mr. Jayson's acts in preparing and signing documents bearing the Kennedy Entities' Wyoming address and even his knowledge that the documents would end up in Wyoming, standing alone, signifies little in the express aiming analysis.

45

The Kennedy Entities attempt to bolster their proof of Mr. Jayson's connection to Wyoming with allegations of CRUPE's contacts with Peter and Paul Kennedy, which were allegedly aimed at inducing them to invest—including allegations regarding meetings abroad, phone calls, and exchanged emails. *See* Aplts.' Opening Br. at 6 (alleging CRUPE's attorney delivered a Confidential Memorandum "directly to Eighteen Seventy in Wyoming by email to Peter and Paul Kennedy"); *id.* at 7 (noting that CRUPE's attorney "sent the Investment Agreement directly to Eighteen Seventy in Wyoming by email addressed to Peter and Paul Kennedy (and no other email recipient) with [Mr.] Robertson [courtesy copied]"). But this line of argument conflates the activities of other CRUPE executives with the activities of Mr. Jayson, individually. As such, it implicates little of relevance to our inquiry, which is centered on whether the personal conduct of Mr. Jayson was sufficient to establish express aiming.

To this point, the Kennedy Entities direct us to multiple emails from CRUPE that reference Wyoming, but Mr. Jayson is merely copied or entirely absent from several of these communications. *See id.* at 11 (describing an email from Mr. Robertson without Mr. Jayson copied); *id.* at 14 (describing an email to Mr. Bihrer that was forwarded to Mr. Jayson). Two other exchanges involved only Paul, the chair of CRUPE's board, who was based in Florida, not Wyoming. *Id.* at 12, 16–17. The sole email exchanges in the record in which Mr. Jayson emailed someone located in Wyoming consisted of emails *responding* to outreach

46

from Paul (the Florida resident) and *copying* Peter (the Wyoming resident): the first two emails indicating that Mr. Jayson could speak on the phone "Thursday . . . anytime U.S. time," Aplts.' App., Vol. II, at 483–85, and a third thanking Paul for recommending a potential recruiting hire in China, *see id.* at 481–82 (Email Exchange, dated Aug. 14, 2014).[16]  The Kennedy Entities also point to a handful of Mr. Jayson's face-to-face meetings with Peter and Paul.  But, notably, these meetings did not even take place in the United States—much less Wyoming.  They were in Hong Kong and Switzerland.  Aplts.' Opening Br. at 8–9, 15.

Considering the full picture, then, all the Entities can point to in attempting to forge a connection between Mr. Jayson and the forum is the fact that Mr. Jayson sent three emails copying someone in Wyoming and several other emails to a member of one of the Kennedy Entities who resided in Florida (Paul

---

[16]    In seeking to establish Mr. Jayson's forum contacts, the Kennedy Entities also reference an email signed "Stuart [Robertson] and Richard [Jayson]" sent to Paul and Peter Kennedy discussing CRUPE's financial performance. Aplts.' Reply Br. at 12 (second alteration in original).  Although Mr. Jayson's name is included in the signature line of this message, we believe that the most reasonable conclusion to reach from the contents of the email—which was sent from Stuart Robertson's email address and copied Mr. Jayson and mentioned him in the third-person in the body of the email—is that Stuart Robertson was actually the sole sender of the email and was not joined in sending it by Mr. Jayson. *See* Aplts.' App., Vol. II, at 511–12 (Email Exchange, dated May 13, 2014) (mentioning "Richard [Jayson] and I" in the first line of the email).  But even if—under a generous application of our standard of review—we were to view this email as another email message from Mr. Jayson, it would not alter our analysis. Like the other three emails in question, this email is addressed to Paul Kennedy (the Florida resident) with Peter Kennedy (the Wyoming resident) copied.  And, like the others, this email contains no indication that Wyoming was a focal point of Mr. Jayson's conduct.

Kennedy), and met with an operator of the Kennedy Entities who resided in Wyoming (Peter Kennedy) in foreign countries over the course of an alleged three-year relationship. These contacts simply are not enough: "the forum state itself must be the 'focal point of the tort.'" *Dudnikov*, 514 F.3d at 1074 n.9 (quoting *Far W. Cap.*, 46 F.3d at 1080). And were a court to rely on them in asserting personal jurisdiction over Mr. Jayson, it would be improperly obliging him "to appear to account for merely 'random, fortuitous, or attenuated contacts' with the forum state" in contravention of due process. *Id.* at 1071 (quoting *Burger King*, 471 U.S. at 475). Notwithstanding the degree of connection that other members of CRUPE may have had with the Kennedy Entities—and we express no opinion on the jurisdictional import of those contacts—Mr. Jayson cannot be said to have made Wyoming the focal point of his allegedly tortious conduct.

In sum, we should not "attribute[]" the Kennedy Entities' connections to the forum—however strong they may be—to Mr. Jayson and allow them to dictate the jurisdictional analysis. *Walden*, 571 U.S. at 289; *accord Rockwood Select*, 750 F.3d at 1180. Here, we conclude that the forum state, Wyoming, was not the focal point of Mr. Jayson's allegedly tortious acts—despite that state being the principal place of business of the Kennedy Entities. And, relatedly, Mr. Jayson's contacts with the forum were too attenuated to allow a court to properly exercise jurisdiction over him. Accordingly, the Kennedy Entities cannot satisfy the

48

second prong of the *Calder* "effects test"—the express aiming requirement.  And this failure to demonstrate express aiming, standing alone, is fatal to the Kennedy Entities' jurisdictional cause: they cannot show that Mr. Jayson purposefully directed his allegedly tortious activity at the forum state, Wyoming. Consequently, the district court correctly determined that it lacked personal jurisdiction over Mr. Jayson.

## IV

For the foregoing reasons, we **AFFIRM** the district court's judgment dismissing the Kennedy Entities' lawsuit for lack of personal jurisdiction.

49