517 P.3d 682
In re STATE of Colorado, EX REL. Philip J. WEISER, Attorney General, Plaintiff,
v.JUUL LABS, INC.; Adam Bowen; James Monsees; Nicholas Pritzker; and Riaz Valani, Defendants.
Supreme Court Case Nos. 22SA108 & 22SA111 Supreme Court of Colorado.
September 26, 2022
Attorneys for Plaintiff: Philip J. Weiser, Attorney General, Eric R. Olson, Solicitor General, Abigail M. Hinchcliff, First Assistant Attorney General, Megan Paris Rundlet, Senior Assistant Solicitor General, Bianca E. Miyata, Assistant Solicitor General, Jeffrey M. Leake, Senior Assistant Attorney General, Brady J. Grassmeyer, Assistant Attorney General, Denver, Colorado
Attorneys for Defendants Adam Bowen, James Monsees, Nicholas Pritzker, and Riaz Valani: Stinson LLP, Zane A. Gilmer, Perry L. Glantz, Denver, Colorado
Attorneys for Defendant Adam Bowen: Boersch & Illovsky LLP, Eugene Illovsky, Sharon Frase, Oakland, California
Attorneys for Defendant James Monsees: Orrick, Herrington & Sutcliffe LLP, James N. Kramer, Lauren B. Seaton, San Francisco, California
Attorneys for Defendants Nicholas Pritzker and Riaz Valani: Kellogg Hansen Todd Figel & Frederick, P.L.L.C., Mark C. Hansen, Michael J. Guzman, David L. Schwarz, Washington, District of Columbia
Attorneys for Amicus Curiae Colorado Trial Lawyers Association: Wahlberg, Woodruff, Nimmo & Sloane LLP, Megan K. Matthews, Denver, Colorado
Balaban Law, LLC, Olga Y. Steinreich, Denver, Colorado
No appearance on behalf of JUUL Labs, Inc.
En Banc
JUSTICE GABRIEL delivered the Opinion of the Court, in which CHIEF JUSTICE BOATRIGHT, JUSTICE MÁRQUEZ, JUSTICE HOOD, JUSTICE HART, and JUSTICE SAMOUR joined.
JUSTICE BERKENKOTTER did not participate.
JUSTICE GABRIEL delivered the Opinion of the Court. ¶1 In these original proceedings pursuant to C.A.R. 21, we review the district court's order denying Adam Bowen, James Monsees, Nicholas Pritzker, and Riaz Valani's (collectively, "defendants’ ") motions to dismiss for lack of personal jurisdiction. Defendants are California residents who served in various capacities as officers or directors of JUUL Labs, Inc. ("JUUL"), an e-cigarette manufacturer, or its predecessor companies. The State of Colorado, through Attorney General Philip J. Weiser, has filed an amended complaint alleging that defendants in their individual capacities, along with JUUL as a corporation, violated several provisions of the Colorado Consumer Protection Act ("CCPA") and are subject to personal jurisdiction in Colorado. Defendants contend that the district court's exercise of personal jurisdiction over them is improper because they lack the requisite minimum contacts with Colorado and the exercise of personal jurisdiction over them is unreasonable in the present circumstances. JUUL does not argue that the district court lacks personal jurisdiction over it.
¶2 We issued a rule to show cause and now conclude that because (1) the district court based its determination on allegations directed against JUUL and the group of defendants as a whole, rather than on an individualized assessment of each defendant's actions, and (2) the State did not allege sufficient facts to establish either that defendants were primary participants in wrongful conduct that they purposefully directed at Colorado, or that the injuries alleged in the amended complaint arose out of or related to defendants’ Colorado-directed activities, the district court erred in finding that the State had made a prima facie showing of personal jurisdiction in this matter.
¶3 Accordingly, we make the rule to show cause absolute and remand this case for further proceedings consistent with this opinion.
I. Facts and Procedural History
¶4 Because this case comes to us in the context of a motion to dismiss that the district court resolved based on the allegations of the amended complaint alone, we take the facts principally from the amended complaint.
¶5 JUUL produces and markets under the JUUL name an electronic nicotine delivery system commonly referred to as an e-cigarette or vaporizer. The JUUL e-cigarette delivers nicotine in self-contained pods that are used in conjunction with a rechargeable handheld device that resembles a USB flash drive. It appears undisputed that JUUL's e-cigarettes and pods are available for purchase online and in retail locations throughout the United States.
¶6 JUUL traces its origins back to 2007, when Bowen and Monsees founded Ploom, Inc., a company that developed and sold pod-based tobacco vaporizers. Bowen served as Ploom's Chief Technology Officer, and Monsees served as its Chief Executive Officer ("CEO"). In 2015, Bowen and Monsees sold Ploom and started Pax Labs, Inc., where they first launched the JUUL product.
¶7 In October of 2015, Monsees, who was then Pax's CEO, stepped down and transferred into the role of Chief Product Officer. For the next ten months, three board members, including Pritzker and Valani, served on an executive committee that effectively ran the company's operations until the board named a new CEO.
¶8 Thereafter, in 2017, JUUL was spun off as a separate company in order to allow it to focus solely on e-cigarettes.
¶9 JUUL has publicly stated that its mission is to transition the world's adult smokers away from combustible cigarettes, to eliminate the use of such cigarettes, and to combat underage usage of JUUL products. In 2018, however, 27% of high school students in Colorado reported that they had vaped within the last thirty days—a rate almost double that of the national rate. And that same year, the commissioner of the U.S. Food and Drug Administration ("FDA") declared that the United States faced an "epidemic of youth-cigarette use."
¶10 Against this backdrop, in July 2020, the State filed a complaint against JUUL setting forth two theories of liability. First, the State alleged that JUUL had "created a public nuisance of youth and adult addiction that substantially, significantly and unreasonably interferes with the well-being of the Colorado public and its health, safety and welfare." Second, the State asserted that JUUL has engaged in numerous deceptive trade practices, each of which constitutes a violation of section 6-1-105(1), C.R.S. (2022), of the CCPA. In particular, the State alleged, among other things, that JUUL had (1) knowingly and recklessly advertised the sale of an addictive nicotine product to youth; (2) failed to disclose that its product contained nicotine and that nicotine is an addictive chemical; (3) knowingly, recklessly, and falsely represented the concentration and quantity of nicotine in JUUL's e-cigarettes; and (4) falsely implied that the primary ingredients in JUUL's e-cigarettes were approved for inhalation by the FDA.
¶11 Notably, the bulk of the State's complaint focused on JUUL's nationwide actions and advertising campaigns, including, among other allegations, that JUUL posted misleading information on its website regarding the ingredients of its products, engaged social media influencers and celebrities to market its products to underage consumers, and used a private company masquerading as a non-profit smoking-cessation organization to generate referrals for JUUL products. With regard to Colorado, the complaint alleged little more than that in September 2015, JUUL held over sixty promotional events at convenience and tobacco store parking lots in this state.
¶12 JUUL moved to dismiss the complaint in part, arguing that (1) the State's public nuisance claim failed under Colorado law and (2) certain of the State's CCPA claims were preempted by federal law. The district court granted JUUL's motion to dismiss as to the public nuisance claim but denied the motion to the extent that it was premised on JUUL's preemption arguments.
¶13 Thereafter, the State amended its complaint to add defendants, in their individual capacities, as defendants in the suit. The amended complaint summarizes the relationships between each individual defendant and JUUL as follows:
Defendant Adam Bowen co-founded the company that became JUUL with Defendant James Monsees in 2007. At all relevant times and up until the present date, Bowen served as the Chief Technology Officer and as a member of the Board of Directors of JUUL or its predecessors ....
Defendant James Monsees co-founded the company that became JUUL with Defendant Adam Bowen in 2007. Monsees served as Chief Executive Officer of JUUL until October 2015 when he transferred into the position of Chief Product Officer of JUUL, until he stepped down from that position in approximately March 2020. At all relevant times Monsees was a member of the Board of Directors of JUUL or its predecessors, until he stepped down in approximately March 2020 ....
Defendant Nicholas Pritzker invested in JUUL's predecessor as early as 2007, and has served on the Pax (JUUL's predecessor) or JUUL Board of Directors since at least June 2014 to the present date. From at least October 2015 through August 2016 Pritzker was on the three-member Executive Committee of the Board of Directors that took managerial control over the company ....
Defendant Riaz Valani has been on the Pax (JUUL's predecessor) or JUUL Board of Directors since at least May 2011 and from at least October 2015 through August 2016, Valani was on the three-member Executive Committee of the Board of Directors that took managerial control over the company.
¶14 In addition to adding the above information about each individual defendant, the State changed over fifty references to "JUUL" in the original complaint to "JUUL and the Management Defendants" in the amended complaint.
¶15 The State further added a section to the amended complaint entitled, "Involvement of the Management Defendants," in which the State alleges that defendants "fully participated in JUUL's deceptive trade practices" and approved JUUL's "unconscionable and unfair marketing to youth," "deceptive messaging about the health, safety and testing of its product," and "deceptive cessation and modified risk marketing." To support these assertions, the State included a 2015 email in which JUUL's former Chief Operating Officer stated, among other things, "Our board members are more involved than most, and likely crazier than most, given the depth of experience they have in this industry."
¶16 With regard to defendants’ personal involvement in JUUL's marketing, the State alleges that on March 23, 2015, defendants attended a board meeting at which they viewed and then discussed examples of JUUL's proposed initial marketing, including a slide that announced, "Influencer Marketing has begun." The State further asserts that in response to materials like these, Pritzker commented that JUUL's branding "feels too young."
¶17 Notwithstanding this relative dearth of specific allegations regarding defendants’ activities, the State contends that defendants personally promoted JUUL's strategy of engaging social influencers who were "especially persuasive to a younger audience." Specifically, the State asserts that when Vanity Fair published a photo of an adult celebrity carrying a JUUL device at an awards ceremony, Valani asked Bowen how they could make the image "go viral" and offered a connection to the celebrity's publicist. The State further contends that Pritzker emailed Monsees to request that JUUL send free products to a member of a popular band, whom JUUL's Marketing Director described as "an ‘influencer’ and one of JUUL's greatest ‘champions.’ "
¶18 With regard to JUUL's allegedly deceptive messaging concerning its products’ safety, the State contends that defendants attended a board meeting at which JUUL's Head of Scientific and Regulatory Affairs made clear that JUUL was putting off certain toxicology testing. The State asserts that in spite of defendants’ awareness that JUUL had not fully tested its products for harmful and potentially harmful constituents, Bowen provided deceptive assurances about JUUL's safety to a JUUL sales representative who had been working to allay concerns expressed by Kroger, a national grocery chain. The State alleges that, in reliance on these assurances, Kroger sold JUUL products in its Colorado stores from 2016 until 2019.
¶19 Lastly, the State alleges that defendants’ communications showed a focus on "debunking studies, and responding to negative press, rather than engaging in substantive changes or youth prevention in a timely fashion." The amended complaint thus quotes an email from Valani to JUUL's board and CEO, in which he requested weekly progress updates on, among other things, JUUL's efforts to "[d]ebunk the studies ... , ideally in coordination with independent researchers"; "[a]nnounce that [JUUL] agree[s] that youth should not use [tobacco products]"; and hire a "credible head" of youth policy. The amended complaint further details how Valani emailed a New York Times article entitled, "The Formaldehyde in Your E-Cigs," to JUUL's CEO and defendants, prompting the CEO to ask the group about the level of formaldehyde in JUUL's products. Monsees responded that the level of formaldehyde in JUUL's e-cigarettes was "[m]uch lower in e-cigs in general compared to cigs" and "[n]early undetectable in JUUL." The State also alleges that in a letter to the editor published by the Denver Post , JUUL's CEO wrote, "[T]he fact that [JUUL] has taken off with youth is as appalling to us as it is to you." Commenting on this letter in an internal email, Valani responded, "Thanks. Great to see."
¶20 Notably, none of the foregoing allegations show any direct connection between defendants and the state of Colorado. Nor do any of these allegations suggest that any of defendants purposefully aimed their activities at Colorado, as opposed to engaging in nationwide marketing activities. Indeed, despite the fact that the amended complaint is 141 pages long, its only allegations specifically concerning Colorado (i.e., allegations beyond those related to nationwide advertising) were that (1) JUUL held sampling events and sold JUUL products in Colorado stores (none of the Management Defendants were alleged to have attended any of these sampling events, which were part of a broader campaign and not unique to Colorado); (2) "youthful images" from JUUL's board-approved marketing plan were shown in marketing displays in Colorado convenience stores, and brand ambassadors who attended the sampling events were instructed to direct consumers to JUUL's website if they had any health- or safety-related questions (these, too, were not unique to Colorado); and (3) JUUL's CEO (not any of defendants) authored a letter to the editor that was published in the Denver Post .
¶21 In response to the State's new allegations, Bowen and Monsees (separately) and Pritzker and Valani (together) filed motions to dismiss the amended complaint. All defendants, who as noted above are California residents, asserted that the district court did not have personal jurisdiction over them. To support this assertion, each defendant contended that the State failed to plead facts sufficient to make a prima facie showing that defendants had established "minimum contacts" with Colorado, as required under International Shoe Co. v. Washington , 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945), and its progeny. Specifically, defendants argued that under Calder v. Jones , 465 U.S. 783, 789–90, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), and Rome v. Reyes , 2017 COA 84, ¶ 32, 401 P.3d 75, 83, a court may exercise personal jurisdiction over the directors of a corporation only when those directors were "primary participants" in the alleged corporate wrongdoing and "expressly aimed" their activities at the forum state. Here, however, defendants contended that the amended complaint did not allege that any of them was a primary participant in any acts directed at Colorado. Specifically, defendants asserted that the amended complaint did not allege that any of them spoke directly with any Colorado residents, signed agreements for work to be performed in Colorado, or otherwise personally participated in any Colorado-based projects or transactions. Defendants thus argued that the amended complaint did not show that they had expressly aimed any activity at Colorado. To the contrary, they said that, at best, the amended complaint described "undirected, national conduct," which was insufficient to establish personal jurisdiction over them.
¶22 Pritzker and Valani further took issue with the State's referring to them as "Management Directors," arguing that they had never held management positions at JUUL. Accordingly, throughout their briefing, Pritzker and Valani referred to themselves as "Non-Management Directors" and asserted that the allegations in the amended complaint were impermissibly "conclusory and group-pled."
¶23 Finally, all defendants contended that even if the State could somehow show that they had minimum contacts with Colorado, the court's exercise of personal jurisdiction over them as California residents would be unreasonable and thus unconstitutional in the present circumstances.
¶24 Without holding an evidentiary hearing, the district court issued an order denying defendants’ motions to dismiss. In this order, the court acknowledged that "in its 145 [sic] pages, nowhere does the [amended complaint] attempt to describe the individual defendants’ connections to Colorado ." (Emphasis added.) Nevertheless, the court reasoned that although the amended complaint "is short on specifics regarding the action of any one of the individual defendants, it is quite specific regarding the actions of the group of them." The court thus rejected defendants’ arguments that the State had failed to make a prima facie showing of personal jurisdiction, explaining, "The individuals are alleged to have conceived, sanctioned, or approved [JUUL's] course of conduct in the commission of the alleged actions. As such, they are potentially liable as individuals. And having potentially committed torts in Colorado, they are subject to the state's long arm statute." (Citation omitted.) For the same reasons, the court rejected defendants’ arguments that it would be unreasonable to subject them to personal jurisdiction in Colorado.
¶25 Bowen and Monsees (separately) and Pritzker and Valani (together) then moved to certify an interlocutory appeal to the court of appeals pursuant to C.A.R. 4.2, but the district court denied those motions.
¶26 Thereafter, Bowen and Monsees (this time together) and Pritzker and Valani (again together) filed petitions under C.A.R. 21 seeking immediate relief from the district court's order denying their motions to dismiss for lack of personal jurisdiction. In these petitions, defendants argued that the district court had erred in concluding that it could properly assert personal jurisdiction over them because (1) the State had failed to allege that defendants were primary participants in any wrongdoing expressly aimed at Colorado, (2) defendants lacked minimum contacts with Colorado, and (3) the exercise of jurisdiction over them would therefore be unreasonable. We issued rules to show cause in each case. Because defendants raise substantively overlapping issues and arguments, we now resolve the two cases together.
II. Analysis
¶27 We begin by discussing our jurisdiction to hear this matter pursuant to C.A.R. 21. Next, we lay out the pertinent principles of law, including the procedure for addressing C.R.C.P. 12(b)(2) motions, the applicable standard of review, and controlling precedent regarding personal jurisdiction. We then apply these principles to the facts before us and conclude that the allegations in the amended complaint are insufficient to establish a prima facie showing of personal jurisdiction over the individual defendants here. Accordingly, we need not consider whether the district court's exercise of jurisdiction over defendants would be unreasonable.
A. Original Jurisdiction ¶28 Whether to exercise original jurisdiction under C.A.R. 21 is a matter within our sole discretion. People v. Tafoya , 2019 CO 13, ¶ 13, 434 P.3d 1193, 1195. "An original proceeding under C.A.R. 21 is an extraordinary remedy that is limited both in its purpose and availability." Id. We generally choose to exercise our discretion under C.A.R. 21 in "cases that raise issues of first impression and that are of significant public importance." Smith v. Jeppsen , 2012 CO 32, ¶ 6, 277 P.3d 224, 226. Further, as pertinent here, "We often elect to hear challenges to ‘the exercise of personal jurisdiction by district courts over out-of-state defendants’ because they ‘raise[ ] the question whether it is unfair to force such a party to defend here at all.’ " Magill v. Ford Motor Co. , 2016 CO 57, ¶ 9, 379 P.3d 1033, 1036 (alteration in original) (quoting Keefe v. Kirschenbaum & Kirschenbaum, P.C., 40 P.3d 1267, 1270 (Colo. 2002) ). ¶29 For three principal reasons we deem it appropriate to exercise our discretion under C.A.R. 21 to hear this matter. First, we have not yet opined on the degree of participation corporate directors must have in a corporation's alleged wrongdoing to subject those directors in their individual capacities to personal jurisdiction in Colorado. Second, we view this issue as one of significant public importance because it not only concerns the rights of the parties in this case but also affects whether non-resident directors of any entity may be haled into court in Colorado. And third, were we to decline to hear this matter pursuant to C.A.R. 21, defendants would be forced to litigate their case in Colorado and would be able to seek relief only after they have shouldered the very burden that they now challenge as improper.
B. C.R.C.P. 12(b)(2) Motions and Standard of Review ¶30 Courts have the discretion to address pre-trial motions filed pursuant to C.R.C.P. 12(b)(2) either by considering only the documentary evidence in the case or by holding a hearing. Archangel Diamond Corp. v. Lukoil , 123 P.3d 1187, 1192 (Colo. 2005). The documentary evidence consists of the allegations made in the complaint and any affidavits and other evidence submitted by the parties. Id. When, as here, the trial court addresses a C.R.C.P. 12(b)(2) motion based on the documentary evidence alone, the trial court must accept as true allegations in the complaint that are not contradicted by the defendants’ competent evidence and must resolve any conflicting facts in the plaintiff's favor. Id. ¶31 Further, when a court chooses to decide a C.R.C.P. 12(b)(2) motion based solely on the documentary evidence, "the plaintiff need only demonstrate a prima facie showing of personal jurisdiction to defeat the motion." Id. This burden is not high—a prima facie showing exists "when the plaintiff raises a reasonable inference that the court has jurisdiction over the defendant." Rome , ¶ 10, 401 P.3d at 79–80 ; see also Archangel , 123 P.3d at 1192 (describing as "light" the burden of making a prima facie showing). ¶32 Whether a plaintiff has made a prima facie showing of personal jurisdiction is a question of law that we review de novo. Magill , ¶ 11, 379 P.3d at 1036.
C. Personal Jurisdiction ¶33 "For a Colorado court to exercise jurisdiction over a non-resident defendant, the court must comply with Colorado's long-arm statute and constitutional due process." Align Corp. v. Boustred , 2017 CO 103, ¶ 9, 421 P.3d 163, 167. Because Colorado's long-arm statute confers on courts "the maximum jurisdiction permitted by the due process clauses of the United States and Colorado constitutions," a plaintiff's ability to establish jurisdiction over a non-resident defendant necessarily depends on whether a Colorado court's exercise of that jurisdiction comports with due process. Id. (quoting Archangel , 123 P.3d at 1193 ). ¶34 In determining whether a court may exercise personal jurisdiction over the defendants in a multi-defendant case, courts must consider each defendant individually. Thus, in Rush v. Savchuk , 444 U.S. 320, 331–32, 100 S.Ct. 571, 62 L.Ed.2d 516 (1980), the Supreme Court concluded that "considering the ‘defending parties’ together and aggregating their forum contacts in determining whether [the district court] had jurisdiction ... is plainly unconstitutional." Likewise, in Calder , 465 U.S. at 790, 104 S.Ct. 1482, the Court opined that employees’ contacts with the forum state "are not to be judged according to their employer's activities there," but rather "[e]ach defendant's contacts with the forum State must be assessed individually." And in Burger King Corp. v. Rudzewicz , 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), the Court emphasized that personal jurisdiction is proper only when "actions by the defendant himself ... create a ‘substantial connection’ with the forum State." (Quoting McGee v. Int'l Life Ins. Co. , 355 U.S. 220, 223, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957).) ¶35 In International Shoe , 326 U.S. at 316, 66 S.Ct. 154, the Supreme Court concluded that a state may exercise personal jurisdiction over a non-resident defendant only when that defendant has "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend ‘traditional notions of fair play and substantial justice.’ " (Quoting Milliken v. Meyer , 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940).) In assessing whether a defendant has minimum contacts with the forum state, "a court properly focuses on ‘the relationship among the defendant, the forum, and the litigation.’ " Calder , 465 U.S. at 788, 104 S.Ct. 1482 (quoting Shaffer v. Heitner , 433 U.S. 186, 204, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977) ). Thus, "[f]or a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State." Walden v. Fiore , 571 U.S. 277, 284, 134 S.Ct. 1115, 188 L.Ed.2d 12 (2014).
¶36 This relationship-based approach to questions of personal jurisdiction has given rise to two distinct categories of jurisdiction, namely, general jurisdiction and specific jurisdiction. Magill , ¶ 15, 379 P.3d at 1037. Here, the State does not allege that general jurisdiction exists with respect to the directors at issue. Accordingly, we turn to the applicable law governing the exercise of specific jurisdiction.
¶37 For purposes of specific jurisdiction, the Supreme Court has instructed that to meet the minimum contacts standard, a non-resident defendant must have "purposefully directed" its activities at residents of the forum state and the plaintiff's injuries must "arise out of or relate to" the defendant's forum-related activities. Burger King , 471 U.S. at 472, 105 S.Ct. 2174 (first quoting Keeton v. Hustler Mag., Inc. , 465 U.S. 770, 774, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984) ; and then quoting Helicopteros Nacionales de Colombia, S.A. v. Hall , 466 U.S. 408, 414, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984) ); accord Eighteen Seventy, LP v. Jayson , 32 F.4th 956, 966 (10th Cir. 2022). Courts have applied a variety of tests to determine whether a defendant's actions satisfy the above-referenced "purposeful direction" standard. For example, in Old Republic Insurance Co. v. Continental Motors, Inc. , 877 F.3d 895, 905 (10th Cir. 2017), the court discussed the "continuing relationships," "market exploitation," and "harmful effects" frameworks for determining whether a non-resident defendant's activities satisfy the purposeful direction requirement. Here, the State argues that defendants’ actions reflect "purposeful direction" under both the effects and market exploitation tests.
¶38 The effects test derives from the Supreme Court's opinion in Calder , 465 U.S. at 785–90, 104 S.Ct. 1482. There, a celebrity who resided in California brought a libel suit in a California court against the president of the National Enquirer and a reporter who worked for that publication, both of whom resided in Florida. Id. at 785–86, 104 S.Ct. 1482. The Court ultimately concluded that jurisdiction in California was proper because defendants were "primary participants" in wrongful conduct that they "expressly aimed" at California. Id. at 789–90, 104 S.Ct. 1482.
¶39 We subsequently employed a Calder - derived analysis in Archangel , 123 P.3d at 1199–1200. Specifically, we applied the articulation of the effects test that the Tenth Circuit had adopted in Far West Capital, Inc. v. Towne , 46 F.3d 1071, 1079 (10th Cir. 1995). See Archangel , 123 P.3d at 1199–1200. In Far West Capital , 46 F.3d at 1079, the court required "a particularized inquiry as to the extent to which the defendant has purposefully availed itself of the benefits of the forum's laws." ¶40 In the time since we decided Archangel , the Tenth Circuit has further distilled the effects test into three elements: "(1) an intentional action; (2) expressly aimed at the forum state; and (3) ... knowledge that the brunt of the injury would be felt in the forum state." Eighteen Seventy , 32 F.4th at 967 (quoting Dental Dynamics, LLC v. Jolly Dental Grp., LLC , 946 F.3d 1223, 1231 (10th Cir. 2020) ). Under this version of the test, the party asserting jurisdiction (here, the State) must establish each of the three elements to demonstrate purposeful direction. Id. Because (1) the Tenth Circuit's recitation of the effects test in Eighteen Seventy is consistent with our understanding of Calder and general due process requirements and (2) all of the parties before us appear to rely on this version of the test, we likewise will apply this version of the effects test to the facts before us. ¶41 The market exploitation test, in turn, derives from the Supreme Court's decision in Keeton , 465 U.S. at 774, 781, 104 S.Ct. 1473. There, the Supreme Court concluded that a non-resident publisher's "regular monthly sales of thousands of magazines" in New Hampshire satisfied the purposeful direction requirement of the minimum contacts analysis. Id. at 774, 104 S.Ct. 1473. In so concluding, the Court explained that when a defendant "has continuously and deliberately exploited the New Hampshire market, it must reasonably anticipate being haled into court there in a libel action based on the contents of its magazine." Id. at 781, 104 S.Ct. 1473. Accordingly, under the market exploitation test, "a defendant purposefully directs activities into the forum State if it continuously and deliberately exploits the forum State's market." XMission, L.C. v. Fluent LLC , 955 F.3d 833, 849 (10th Cir. 2020). Factors suggesting purposeful direction based on forum state market exploitation include "high sales volume and large customer base and revenues" and "extensive nationwide advertising or ads targeting the forum state." Old Republic , 877 F.3d at 915. ¶42 The parties here dispute whether the market exploitation framework is available to the State as a means of demonstrating that defendants (as opposed to JUUL) satisfy the "purposeful direction" component of the minimum contacts analysis. The State contends that "if an individual is directly involved in unlawful acts that he knows will reach the forum state through his company's continuous and deliberate exploitation of the forum market, he can expect to answer for his acts in the forum state." Defendants, in contrast, argue that the market exploitation test does not apply to individual corporate directors but rather to the corporate entity, which is the true market participant. We agree with defendants.
¶43 In Old Republic , 877 F.3d at 907 n.14, the court observed, "In Calder , the Court could not rely on the market exploitation basis for personal jurisdiction because, unlike in Keeton , the plaintiff sued the reporter and the editor who worked on the allegedly defamatory article rather than their corporate employer." Such a ruling suggests that the market exploitation test does not apply to corporate employees but only to the corporate entity itself. Indeed, the State does not cite, and we have not found, a published decision in which a court subjected a corporate director, rather than the corporation itself, to jurisdiction under the market exploitation framework. And this is unsurprising. Although courts can readily attribute factors such as sales volume, a customer base, and revenues to corporate entities, these factors are not readily attributable to individual directors.
¶44 Even were we to conclude that the market exploitation test could theoretically apply to directors in their individual capacities, however, at no point does the State allege that any of defendants here had the continuous contacts with Colorado necessary to succeed under that framework. See XMission , 955 F.3d at 849. Accordingly, we will apply the "effects test" rather than the "market exploitation test" to determine whether Colorado courts may exercise personal jurisdiction over defendants here. ¶45 Finally, if a court determines that a non-resident defendant has the requisite minimum contacts with the forum state, then "these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with ‘fair play and substantial justice.’ " Align , ¶ 13, 421 P.3d at 168 (quoting Keefe , 40 P.3d at 1271 ). In making this determination, we may consider "the burden on the defendant, the forum state's interest in resolving the controversy, and the plaintiff's interest in attaining effective and convenient relief." Archangel , 123 P.3d at 1195.
¶46 Having thus set forth the applicable law, we now turn to the specific issues presented in this case.
D. Application ¶47 As noted above, to establish personal jurisdiction under the effects test, the party asserting jurisdiction must show "(1) an intentional action; (2) expressly aimed at the forum state; and (3) ... knowledge that the brunt of the injury would be felt in the forum state." Eighteen Seventy , 32 F.4th at 967 (quoting Dental Dynamics , 946 F.3d at 1231 ). For several reasons, we conclude that the State has not carried this burden here. ¶48 First, the State seeks to establish personal jurisdiction by aggregating forum contacts. This, however, is directly contrary to Supreme Court precedent forbidding precisely this type of pleading to establish personal jurisdiction. See Rush , 444 U.S. at 331–32, 100 S.Ct. 571. Indeed, the district court essentially conceded that it was relying on such aggregated contacts.
¶49 Specifically, the district court framed the issue before it as "whether [JUUL's] actions, as alleged, are sufficient to assert long arm jurisdiction over the individual movants, all of whom are or were officers and/or directors of [JUUL] during the relevant time." The court then reviewed the allegations in the amended complaint and noted, "While the [amended complaint] is short on specifics regarding the action of any one of the individual defendants, it is quite specific regarding the actions of the group of them." After considering allegations related to "group action," citing to Hoang v. Arbess , 80 P.3d 863 (Colo. App. 2003), and observing that "separating out the individual defendants" may not be "practical or possible for pleading purposes," the court concluded that the alleged "group action" conferred personal jurisdiction over each individual defendant.
¶50 Hoang , however, does not support the district court's conclusion. There, a division of the court of appeals explained:
While an officer of a corporation cannot be held personally liable for a corporation's tort solely by reason of his or her official capacity , an officer may be held personally liable for his or her individual acts of negligence even though committed on behalf of the corporation, which is also held liable. Id. at 867 (emphasis added).
¶51 As an initial matter, we note that the division in Hoang was addressing whether a corporate officer's actions subjected him to liability, not personal jurisdiction. Id. at 866. The district court then appears to have done the same, apparently conflating the issues of director liability and personal jurisdiction over a director. Regardless, the district court appears to have engaged in the very reasoning that Hoang prohibits, namely, subjecting defendants to liability for JUUL's alleged torts based solely on defendants’ official capacities. Thus, the court explained that as "founders, board members, and/or Executive Committee members who essentially directed [JUUL] activities," each individual defendant was "potentially liable" for JUUL's course of conduct.
¶52 For the same reason, we are unpersuaded by the State's reliance on an email in which JUUL's former Chief Operating Officer claimed that, collectively, JUUL's board members were "more involved than most, and likely crazier than most." This comment discloses nothing about any individual's conduct or how any such conduct was directed toward Colorado.
¶53 And we are not persuaded by the district court's assertion that "separating out the individual defendants [may] not [be] practical or possible for pleading purposes." The district court offers no explanation as to why this is so, particularly given that the State appears to have received discovery in its case against JUUL before it filed its amended complaint. Regardless, due process does not permit us to curtail a defendant's constitutional protections simply because compliance with settled principles of law may be difficult.
¶54 Second, at least as to Pritzker and Valani, the State does not allege the requisite intentional action to satisfy the first prong of the effects test. See Eighteen Seventy , 32 F.4th at 967. The effects test applies only to "the defendant's suit-related conduct." Walden , 571 U.S. at 284, 134 S.Ct. 1115. Here, many of the State's allegations against Pritzker and Valani, including its contentions that they had viewed presentations announcing that "Influencer Marketing has begun" and describing JUUL's toxicology testing, do not describe "conduct" at all, much less Colorado-directed conduct. Instead, these allegations paint Pritzker and Valani as passive recipients of information. The remainder of the State's allegations against Pritzker and Valani describe only conduct that is highly attenuated from JUUL's alleged wrongdoing. For example, in an attempt to demonstrate that Pritzker and Valani participated in youth marketing, the State points to (1) Pritzker's request that JUUL send free products to an adult member of a popular band and (2) Valani's question regarding how to make a photo of an adult celebrity holding a JUUL device "go viral." Lastly, in an attempt to establish that Valani participated in the allegedly deceptive messaging, the State claims that Valani forwarded a New York Times article entitled, "The Formaldehyde in Your E-Cigs." The simple acts of sending products to an adult consumer, commenting on a photo, or forwarding an email do not, however, indicate that Pritzker or Valani engaged in JUUL's alleged wrongdoing, much less that they engaged in wrongdoing directed at Colorado.
¶55 Indeed, many of the facts alleged by the State belie its assertions that Pritzker and Valani "approved of, directed, actively participated in, or cooperated in ... deceptive and unconscionable marketing." For example, Pritzker expressed his concern that JUUL's branding felt "too young," and Valani favorably commented on a letter to the editor of the Denver Post in which JUUL's CEO stated that the company was "appalled" that JUUL had taken off with youth. Valani further requested updates on JUUL's efforts to hire a "credible head" of youth policy. Collectively, these comments tend to show that Pritzker and Valani dis approved of (or at least had concerns about) JUUL's alleged attempts to target youth and sought to engage "credible" sources of information rather than deceptive ones, thereby undermining the State's effort to premise personal jurisdiction on these directors’ purported approval of, direction, active participation in, or cooperation in deceptive marketing.
¶56 Third, the State alleges no facts supporting a conclusion that any of defendants expressly aimed their conduct at Colorado, as required under the second prong of the effects test. Indeed, it appears that the only Colorado-specific contacts alleged by the State were that (1) JUUL held sampling events and sold JUUL products in Colorado stores; (2) "youthful images" from JUUL's board-approved marketing plan were shown in marketing displays in Colorado convenience stores, and brand ambassadors who attended the sampling events were instructed to direct consumers to JUUL's website if they had any health- or safety-related questions; and (3) JUUL's CEO authored a letter to the editor that was published in the Denver Post . The State does not allege, however, that any of defendants planned or attended the sampling events. Nor does the State allege that any of defendants drafted the letter (or, for that matter, that the letter misrepresented JUUL's products). As a result, the district court itself acknowledged that "in its 145 [sic] pages, nowhere does the [amended complaint] attempt to describe the individual defendants’ connections to Colorado." We agree, and we therefore conclude that the allegations in the amended complaint do not satisfy the express aiming requirement of the effects test. ¶57 Perhaps recognizing the absence of individualized conduct expressly aimed at Colorado, the State contends that an individual corporate director's participation in their company's nationwide actions satisfies the express aiming requirement, at least when the individual knows that the company's actions will reach the forum state through the company's continuous and deliberate exploitation of the forum state's market. Although we have not previously addressed this issue directly, a division of our court of appeals has done so, and its reasoning is instructive.
¶58 In Giduck v. Niblett , 2014 COA 86, ¶ 20, 408 P.3d 856, 864, the plaintiff, a Colorado attorney, alleged that a group of non-resident defendants had posted defamatory statements about him on a website and that these statements were subsequently published on other websites, including Amazon and Facebook. Id. The plaintiff asserted that the defendants knew that he was a Colorado resident and member of the Colorado bar and that they agreed to, and did, publish false statements about him to harm his reputation as a Colorado attorney. Id. Although the plaintiff argued that these actions supported jurisdiction over the defendants, the division disagreed. Id. at ¶¶ 20–21, 408 P.3d at 864. Relying on the Supreme Court's conclusion in Walden , 571 U.S. at 290, 134 S.Ct. 1115, that "[r]egardless of where a plaintiff lives or works, an injury is jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the forum State," the division determined that the defendants’ widely distributed statements did "not focus on Colorado" and therefore did "not provide sufficient minimum contacts to subject defendants to personal jurisdiction" here. Giduck , at ¶¶ 23–24, 408 P.3d at 865 (quoting Walden , 571 U.S. at 290, 134 S.Ct. 1115 ).
¶59 This analysis is consistent with recent case law from the Tenth Circuit. In Eighteen Seventy , 32 F.4th at 959–61, for example, two Wyoming entities alleged that Jayson, a resident of the United Kingdom, had, through misrepresentations and omissions, induced their investments in a foreign company of which Jayson was a director and chief financial officer. Noting that Jayson had never visited Wyoming and that there was "nothing unique about [the plaintiff entities], much less Wyoming, that led Mr. Jayson to prepare fraudulent materials," the court concluded that "the focal point of Mr. Jayson's allegedly tortious acts clearly was not Wyoming and, relatedly, that any contacts by Mr. Jayson with Wyoming were too attenuated to allow a court to exercise jurisdiction over him." Id. at 975.
¶60 The same is true here. Any actions that defendants took in relation to JUUL's nationwide marketing campaign were not "expressly aimed" at Colorado. Similar to the allegedly defamatory statements in Giduck and the fraudulent materials in Eighteen Seventy , defendants did not direct JUUL's alleged messaging and materials at any particular geographic location. Nor does anything in the amended complaint suggest that defendants targeted influencers in Colorado, prioritized launching JUUL's products in Colorado over other states, or tailored any of its materials to appeal to Colorado consumers. And although the State alleges that Monsees communicated with a JUUL sales representative who in turn spoke with a representative of Kroger, which then sold JUUL products in its Colorado stores, this interaction exemplifies the kind of attenuated contacts that the court in Eighteen Seventy , 32 F.4th at 975, concluded did not satisfy the express aiming requirement.
¶61 Because the State cannot satisfy the first or second prongs of the effects test (i.e., intentional action expressly aimed at Colorado), we conclude that the State has not established personal jurisdiction over defendants in this case. Accordingly, we need not reach the third prong of the effects test.
¶62 We are not persuaded otherwise by the out-of-state cases on which the State relies. The State particularly urges us to consider two decisions in which the federal district court for the Northern District of California concluded that five states involved in a multi-district litigation action could properly exercise personal jurisdiction over the defendants, including the four individual defendants who are now before this court. See In re JUUL Labs, Inc. (JUUL II ), 533 F. Supp. 3d 858, 879 (N.D. Cal. 2021) (concluding that personal jurisdiction existed over Pritzker and Valani); In re JUUL Labs, Inc. (JUUL I ), 497 F. Supp. 3d 552, 675–77 (N.D. Cal. 2020) (denying Bowen and Monsees’ motion to dismiss for lack of personal jurisdiction based on their "involvement in the development and implementation of the challenged nationwide marketing campaign and its intended effects in the forum states"). Obviously, we are not bound by these district court decisions. And in any event, we are not convinced by their limited analyses. For example, in JUUL I , the court acknowledged the express aiming requirement but then glossed over it entirely, focusing instead on JUUL's nationwide conduct. JUUL I , 497 F. Supp. 3d at 675–77. As set forth above, we do not agree that personal jurisdiction over corporate directors can be predicated on a corporation's nationwide contacts alone.
¶63 In our view, the New York Supreme Court's decision in People ex rel. James v. JUUL Labs, Inc. , No. 452168/2019, 2022 WL 2757512, at *3–6 (N.Y. Sup. Ct. July 14, 2022), which involved the same parties and jurisdictional questions as are now before us, is analytically more sound. There, the court summarized the alleged contacts between the defendants and New York, noting the People's allegations that (1) Monsees and Bowen were part of a public relations strategy that was aimed at New York, and both were scheduled to meet with the press and with investors while in New York for JUUL's launch; (2) Bowen had sent an email to a member of the JUUL marketing team commenting on how to increase the number of New Yorkers trying JUUL e-cigarettes; (3) while in New York, Valani had sent comments to JUUL senior management regarding defaced marketing materials; (4) Valani had worked with JUUL's marketing team to ensure that JUUL products were available at a Met Gala afterparty in Manhattan; (5) Monsees, Bowen, Pritzker, and Valani had attended board meetings at which New York was identified as a focus of the launch campaign; (6) these defendants were provided information regarding the success of the New York launch; (7) Valani had been involved in meetings to discuss a strategy for responding to New York City anti-tobacco legislation; and (8) Monsees, Pritzker, and Valani had met and communicated with New York investors in New York, and this meeting had resulted in an investment by a New York-based investment firm. Id. at *3–4.
¶64 The New York court found that the amended complaint in that case contained sufficient allegations to establish personal jurisdiction over Monsees and Bowen, in part because the two men had actively participated in the deceptive marketing aimed at teens in New York, including attending the New York launch campaign, and thus they had personally transacted business in New York. Id. at *5. With regard to Pritzker and Valani, however, the court came to the opposite conclusion, explaining that although these two defendants "knew of and approved the marketing of JUUL's product, JUUL marketed the product throughout the country and not just in New York." Id. at *6. This, the court opined, was insufficient to establish that these defendants personally transacted business in New York. Id.
¶65 The factual allegations in the New York case stand in sharp contrast to those now before us. Here, the State never alleges that JUUL identified Colorado as a priority or that defendants visited Colorado for business purposes. Nor does it contend that defendants engaged in communications regarding the number of Coloradans who have tried JUUL. Instead, the State contends only that defendants participated to some extent in JUUL's nationwide efforts to market its product.
¶66 We likewise are unpersuaded by the State's and amicus curiae's public policy concerns. Specifically, the State and its amicus curiae respectively contend that (1) denying the existence of personal jurisdiction over defendants here would mean "that a defendant does not target Colorado if, at the same time, it also targets other states," and (2) our decision today will permit non-resident defendants to "claim immunity from suit because they have not physically set foot in the state." We disagree with both of these contentions. A defendant can certainly target multiple states simultaneously, and had the record shown that these defendants individually targeted Colorado, among other states, then our conclusion might have been different. Moreover, nothing in our decision today suggests that non-resident defendants can claim immunity merely because "they have not physically set foot" in Colorado. As discussed above, the proper inquiry is whether defendants expressly aimed any conduct here, and this requirement can, in certain circumstances, be satisfied absent any physical presence in this state. And we perceive nothing in our analysis that can reasonably be read to immunize these defendants from their alleged actions. The State is free to bring suit where defendants are subject to personal jurisdiction. We merely conclude that these defendants are not subject to personal jurisdiction here.
¶67 In contrast to the State's policy arguments, defendants contend that, were we to accept the State's assertion that conduct need not be specially directed at the forum state to satisfy the express aiming requirements, directors of a corporation that does business nationwide would potentially be subject to personal jurisdiction in every state, regardless of their lack of connection to a particular forum. As defendants assert, this is simply not the law, and adopting such a principle would impose significant costs on board service and could dramatically drive up the costs of doing business in Colorado (by, for example, substantially increasing the premiums for directors and officers liability insurance). We cannot perceive how such a result would advance any sound public policy of this state.
¶68 For these reasons, we conclude that the State did not plead facts sufficient to establish that the individual defendants now before us purposefully directed wrongful conduct at Colorado or that the injuries alleged in the amended complaint arose out of or related to defendants’ Colorado-directed activities. Accordingly, we further conclude that the State did not make the requisite prima facie showing of personal jurisdiction over these defendants.
¶69 In light of this determination, we need not address the question of whether exercising personal jurisdiction over defendants here would be unreasonable.
III. Conclusion
¶70 Because (1) the district court based its determination on allegations directed against JUUL and the group of defendants as a whole, rather than on an individualized assessment of each defendant's actions, and (2) the State did not allege sufficient facts to establish either that defendants were primary participants in wrongful conduct that they purposefully directed at Colorado, or that the injuries alleged in the amended complaint arose out of or related to defendants’ Colorado-directed activities, we conclude that the district court erred in finding that the State had made a prima facie showing of personal jurisdiction in this matter.
¶71 Accordingly, we make our rule to show cause absolute and remand this case for further proceedings consistent with this opinion.